**UNITED STATES, Appellee,**

v.

**Daniel J. DONLON,
Defendant, Appellant.**

**No. 90–1032.**

United States Court of Appeals,
First Circuit.

Heard May 11, 1990.

Decided July 27, 1990.

John C. McBride, with whom McBride, Wheeler & Widegren, Boston, Mass., was on brief, for appellant.

David A. Vicinanzo, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before BREYER, Chief Judge, ROSENN,[*] Senior Circuit Judge, and CAMPBELL, Circuit Judge.

BREYER, Chief Judge.

Daniel Donlon, a previously convicted felon, appeals his conviction for having unlawfully possessed a firearm. *See* 18 U.S.C. § 922(g)(1). A basic factual question at trial was whether or not a pistol that police found under a laundry basket belonged to him. His former girlfriend, Sherry Cardoza, who is now his wife, gave incriminating grand jury testimony. Later, at trial, she invoked the "spousal" privilege against testifying. The district court then admitted her earlier grand jury testimony into evidence. Donlon says that the court could not legally admit that grand jury testimony. We have considered this claim, and the other legal arguments that Donlon makes. We conclude that we must affirm his conviction.

### I.

### *Background*

Reading the record in a manner appropriately favorable to the government, *see, e.g.,* *United States v. Torres Lopez*, 851 F.2d 520, 527–28 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989); *United States v. Wiseman*, 814 F.2d 826, 828 (1st Cir.1987), we believe the key facts are the following:

The Hudson, New Hampshire police department received a call at about 1:30 in the morning on October 31, 1987. The caller, who lived next door to 16–A River Road, said he heard several gunshots inside

* Of the Third Circuit, sitting by designation.

the house at that address. Two police officers then went to the house. As they approached, Donlon appeared behind the screen door; he seemed drunk; he shouted at them to get off his property. The officers explained why they were there, satisfied themselves he was not armed, and said they wanted to check the house to make certain no one was hurt. Donlon said he did not want to let them in, but he then opened the door and let the officers inside.

Donlon told the officers he had had an argument with his girlfriend and that he had thrown a beer bottle through a sliding glass door at the rear of the house. He took them to the back, where they saw the door, broken glass, and a bottle. They asked if anyone else was in the house, and Donlon replied that his children were upstairs sleeping.

At that point the officers heard voices upstairs. A man (a friend of Donlon's) and a woman (the babysitter) came downstairs, the woman crying. The woman went back upstairs and returned with two children. Sherry Cardoza, the children's mother, phoned. She told one of the officers that she wanted the babysitter and her children taken away from the house and that she would ask her sister-in-law to pick them up. Donlon and his friend also said they wanted to leave. Donlon asked for a ride to a motel. The officers said they would call another police car to take them.

Donlon, accompanied by a police officer, went to the bedroom upstairs to get some money and clothes. The officer saw an assault rifle hanging behind the bedroom door. Soon thereafter, the babysitter, while getting ready to leave, picked up a laundry basket in the living room, where the officers were then standing, and the officers saw a nine-millimeter pistol beneath the basket. One of them took the gun to the car. Donlon asked when he could get it back. The officer replied that he could have it the next evening if Donlon was sober. Donlon added that he had other guns in the house.

Subsequently, the government discovered that Donlon was a previously convicted felon. It began a grand jury investigation.

Sherry Cardoza testified before the grand jury that, on October 31, she and Donlon were living together at 16–A River Road and that Donlon, at that time, had "more than five" guns in the house. The grand jury indicted Donlon on charges of unlawfully possessing eleven guns. The trial court suppressed ten of the eleven guns, as illegally seized. The case proceeded to trial in respect to the eleventh gun, the nine-millimeter pistol found under the laundry basket. At the trial Donlon claimed that the pistol belonged to a friend, Brian Kelly, who had briefly left the gun in the house. Sherry Cardoza invoked spousal immunity and refused to testify. The court permitted the government to read her grand jury testimony to the jury. The jury convicted Donlon of unlawfully possessing the pistol.

After his conviction, Donlon failed to appear for sentencing. The court ordered forfeiture of bail (real estate belonging to Donlon's brother). U.S. Marshals captured Donlon three months later. The court sentenced him, and he now appeals.

## II.

### The Admission of Grand Jury Testimony

■■ Donlon's major argument is that the district court could not lawfully admit Sherry Cardoza's grand jury testimony into evidence. Though the testimony is hearsay, the court admitted it under the authority of Fed.R.Evid. 804(b)(5). Rule 804(b) sets forth five categories of testimony that "are not excluded by the hearsay rule if the declarant is unavailable as a witness." The categories are "(1) *Former testimony* .... (2) *Statement under belief of impending death* .... (3) *Statement against interest* .... (4) *Statement of personal or family history* .... (5) *Other exceptions* ...." Fed.R.Evid. 804(b). The Rule defines this last category, the "Other exceptions" or "residual" category, as including a

statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines

that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....

Fed.R.Evid. 804(b)(5). Donlon concedes that Sherry Cardoza was "not available as a witness" and that her grand jury testimony satisfies subconditions (A) and (B); he does not argue that admission of that testimony violated subcondition (C). But, he makes two other arguments against admissibility.

First, Donlon makes an argument that we cast in the following syllogistic form:

*Premise one.* Exception (1), the exception for "former testimony," applies to grand jury testimony.

*Premise two.* Since exception (1) applies, exception (5) cannot apply.

*Premise three.* Exception (1) applies to "Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition ..."

*but only if*

"the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or re-direct examination."

Fed.R.Evid. 804(b)(1).

*Premise four.* Sherry Cardoza's grand jury testimony does not satisfy the "opportunity for cross-examination" condition.

*Conclusion.* Sherry Cardoza's grand jury testimony is not admissible.

Since no party other than the government can examine a witness before a grand jury, this argument, if accepted, would make grand jury testimony inadmissible, no matter how great the need or how strong the guarantees of trustworthiness. It does not surprise us, therefore, that every circuit court that has considered this kind of argument has rejected it and held that the "residual exception," exception (5), is potentially applicable to grand jury testimony. *See United States v. Fernandez,* 892 F.2d 976, 981 (11th Cir.1989), *cert. dismissed sub nom. Recarey v. United States,* —— U.S. ——, 110 S.Ct. 2201, 109 L.Ed.2d 527 (1990); *United States v. Curro,* 847 F.2d 325, 327–28 (6th Cir.), *cert. denied,* 488 U.S. 843, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988); *United States v. Guinan,* 836 F.2d 350, 353–54 (7th Cir.), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *United States v. Marchini,* 797 F.2d 759, 763 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Murphy,* 696 F.2d 282, 286 (4th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *United States v. Barlow,* 693 F.2d 954, 960 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. West,* 574 F.2d 1131, 1135–36 (4th Cir.1978); *United States v. Carlson,* 547 F.2d 1346, 1353–55 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *see also United States v. Zannino,* 895 F.2d 1, 6 (1st Cir.) (indicating approval of the practice of admitting uncross-examined grand jury testimony into evidence at a subsequent trial "where the declarant is no longer available and the requisite indicia of reliability exist"), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

The argument's weak points lie in premises one and two. *Premise One* says that the "former testimony" exception (exception one, Fed.R.Evid. 804(b)(1)) was meant to encompass grand jury proceedings. We do not believe that is so. We concede that its words "testimony ... at a different proceeding," read literally, would include grand jury proceedings. But, the Rules Advisory Committee, explaining exception one in its Notes, says, "Former testimony does not rely upon some set of circumstances to substitute for oath and cross-examination, since both oath and opportunity to cross-examine were present in fact." Fed.R.Evid. 804(b)(1), advisory committee's

note. It thereby makes clear that exception one was written in respect to *those kinds of proceedings for which cross-examination was potentially available;* and, grand jury proceedings do not fall within that category.

*Premise Two* says that the potential applicability of exception one means that exception five (Fed.R.Evid 804(b)(5)) is not available. But, we do not believe that the "potential" availability of one kind of hearsay exception automatically rules out the use of another. After all, normally, hearsay testimony is admissible if it satisfies any one exception. A declaration against penal interest, for example, is no less admissible simply because the declarant made the statement while testifying as a witness at an earlier trial (and vice versa). Why must a proponent of such evidence satisfy the special conditions for more than one such exception? Of course, the language of exception (5), the residual exception, insists upon "*equivalent* circumstantial guarantees of trustworthiness;" and one might argue that, in the case of a prior proceeding, the only "guarantee" that is the "equivalent" of an opportunity for cross-examination is "an opportunity for cross-examination." Yet, we do not see why that should be so either, at least in the case of a class of proceeding where there could be no such opportunity, where there seems no special reason for disqualifying that class *ipso facto* from admissibility (where other guarantees of trustworthiness do exist), and where the Rule's framers indicated no such disqualifying intent. Indeed, the very use of the word "equivalent," suggesting there must be something special about the guarantee of trustworthiness, offers, in principle, a safeguard against the courts' use of the residual exception to swallow up the hearsay rule.

Consequently, we shall follow all other circuits that have considered this matter and hold that prior grand jury testimony falls within the category of hearsay to which the exception (5), the residual exception, *potentially* applies.

■ Second, Donlon argues that, in this case, there were no such "equivalent circumstantial guarantees of trustworthiness." We have read the record here, however, in light of other cases in which courts have lawfully admitted evidence under the "residual" hearsay exceptions. We have found that Sherry Cardoza gave the grand jury testimony under oath; *see Boulahanis,* 677 F.2d at 588; *Carlson,* 547 F.2d at 1354; the testimony concerned matters within her personal knowledge; *see Marchini,* 797 F.2d at 764; *Carlson,* 547 F.2d at 1354; *Barlow,* 693 F.2d at 962; she has never recanted her testimony; *see Marchini,* 797 F.2d at 764; *Carlson,* 547 F.2d at 1354; there is no evidence suggesting that she was unreliable; *see Fernandez,* 892 F.2d at 983; she did not testify under a grant of immunity; *see Fernandez,* 892 F.2d at 983; *Guinan,* 836 F.2d at 351; and no extrinsic evidence seriously undermined her version of the relevant events; *see Zannino,* 895 F.2d at 7. We can find no significant motive that Ms. Cardoza might have had to hurt Donlon by lying. Indeed, no one seemed likely to have believed that she herself owned the guns, nor is there reason to think she could not lawfully have done so. In fact, if she had been lying in order to avoid any such suspicion, why would she have volunteered the fact that she herself had bought one of the guns and given it to Donlon for a Christmas present? *See Guinan,* 836 F.2d at 355 (stating that one of the factors in the 804(b)(5) analysis is whether the hearsay declarant had "a motive to lie that calls the trustworthiness of her statements into question").

Finally, the record contains other evidence that substantially corroborates the significant portions of Ms. Cardoza's grand jury testimony. Ms. Cardoza told the grand jury (1) that Donlon was living at 16–A River Road on October 31, and (2) that Donlon had other guns in the house. As to the first statement, Donlon's lease was in evidence at the trial, as was a statement by his probation officer saying that Donlon said that he lived there between February and December, along with a statement by a police officer that Donlon ordered the police off the property on that date. As to the second statement, the record contains a statement by a police

officer that Donlon himself said he had other guns in the house. We would describe this corroboration as significant, but far from overwhelming. Of course, were corroborating evidence, by itself, completely convincing, there would rarely be any need to introduce the evidence that it corroborates. *See, e.g., Guinan,* 836 F.2d at 357 ("the proponent [seeking to introduce evidence under 804(b)(5)] will always be relying on 'a little more' than is independently corroborated").

We have said that "[n]o single factor is dispositive on the issue of whether evidence should be admitted under the residual exception. The district judge must evaluate all of the factors...." *Brookover v. Mary Hitchcock Memorial Hospital,* 893 F.2d 411, 420 (1st Cir.1989). We have also said, in criminal as well as in civil cases, that we shall uphold a district court's decision to admit evidence under the "residual" hearsay exceptions "unless we have 'a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'" *Brookover,* 893 F.2d at 419 (quoting *United States v. Doe,* 860 F.2d 488, 491 (1st Cir.1988)), *cert. denied sub nom. Crespo–Herrera v. United States,* — U.S. —, 109 S.Ct. 1961, 104 L.Ed.2d 430 (1989). In this case, we have found numerous factors supporting the district court's determination. The only factor we have found that some courts have viewed negatively is the fact that Ms. Cardoza was not represented by counsel before the grand jury. *See Marchini,* 797 F.2d at 764. This factor, here virtually alone, does not provide a sufficient basis to overturn the district court's determination, which we consequently uphold as lawful.

## III.

### Other Arguments

We shall discuss Donlon's remaining arguments more briefly, simply indicating the basic reasons why we reject them.

■ 1. Donlon argues that the police officers were unlawfully in his house, and consequently the district court should have suppressed as evidence the pistol that they found there. The evidence at the suppression hearing, however, was more than sufficient for the court to find (1) that Donlon, by opening the screen door, effectively gave his permission to enter, or (2) that the report of gunshots, the presence of a belligerent Donlon, the broken glass and bottle thrown through the back door, the presence of children upstairs, demonstrated "exigent" circumstances authorizing the police officers' subsequent conduct. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (noting that consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause"); *United States v. Rengifo,* 858 F.2d 800, 805 (1st Cir.1988) (citations omitted), *cert. denied,* — U.S. —, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989) (stating that "exigent circumstances" exist "when a reasonable officer could believe that to delay acting to obtain a warrant would, in all likelihood, permanently frustrate an important police objective, such as to prevent the destruction of evidence relating to criminal activity or to secure an arrest before a suspect can commit further serious harm"). The court was, of course, free to credit the testimony of the officers in this regard and to discredit conflicting testimony from Donlon. *See, e.g., United States v. Oates,* 560 F.2d 45, 49 (2d Cir. 1977).

■ 2. Donlon says that the evidence was not sufficient to show, beyond a reasonable doubt, that he possessed the gun. The jury, however, could reasonably credit testimony showing that the police officers found the gun in Donlon's house, only a few feet from where he was standing, that shattered glass and damage to an outside trailer might have been caused by bullets, that Donlon asked the police, when they seized the gun, when *he* could get it back, and that Donlon's girlfriend said he had both "short" and "long" guns in the house. The jury was free to discredit testimony of Brian Kelly, a friend of Donlon's, who said the gun was his. *See, e.g., United States v. Torres Lopez,* 851 F.2d 520, 527 (1st Cir.1988), *cert. denied,* — U.S. —, 109

S.Ct. 1144, 103 L.Ed.2d 204 (1989) (holding that assessment of witnesses' credibility is a matter for the trier of fact). Given their legal power to decide which witnesses to believe, the jury could easily have found guilt beyond a reasonable doubt.

■ 3. Donlon says that the district court should have permitted him to stipulate to the fact that he was a previously convicted felon. We have held, however, that "even in the face of an offer to stipulate, the government may choose to present evidence on the one felony necessary to prove the crime charged." *United States v. Collamore*, 868 F.2d 24, 28 (1st Cir.1989) (citations omitted). The court therefore did not err in permitting the government to do this.

■ 4. Donlon says that the district court should not have made a general prospective ruling that, in effect, prevented him from calling a witness, Harold Crosby, Jr. The court ruled that, if Crosby testified, the government could inquire into his use of aliases and his having submitted false information to law enforcement officials. Donlon says that this ruling was too broad. To test the breadth of that ruling, however, Donlon should have called the witness and then objected to specific questions. *See United States v. Nivica*, 887 F.2d 1110, 1115–17 (1st Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). Donlon did not call the witness; hence the district court's prospective ruling "never ripened into an appealable matter." *United States v. Griffin*, 818 F.2d 97, 103 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).

5. Donlon says that the prosecutor made improper remarks during closing argument:

■ a. The first set of challenged remarks consist of statements about Donlon's friend Kelly. Kelly had said that, on October 31, he, Crosby, and two others were on their way to a bar after target practice, that they stopped at a house that might have been Donlon's, that Crosby had brought the nine-millimeter pistol into the house and had left it there. The prosecutor, pointing out that Kelly could not provide many details about what happened on that day, went over Kelly's story:

> He went in the Tiki Hut and he met Harold Crosby, the defendant's cousin, and two other unknown males, still unknown.... After they had a couple of drinks, they went into the parking lot and they got into one of the other unknown males' cars, maybe a Chevy or a Ford, but four doors.... [E]ventually they got off somewhere deep in the woods with the cousin of the defendant and two unknown males.

Donlon says the use of the term "unknown males" was an effort to make the jury think he should have called them as witnesses, and that it thereby impermissibly shifted the burden of proof.

In our view, to state this argument is to refute it. It strikes us as too farfetched, in context, to believe that the prosecutor was trying to shift the burden of proof. He was more likely pointing out the fact that Kelly had not supplied the names of the two men, thereby suggesting, through the lack of one more detail, that Kelly was making the story up. That, in our view, is what the jury would think he was doing. In any event, the prosecutor wanted to refer to the two unknown men; we cannot think of a less harmful way to do so.

■ b. Donlon's friend, who was in the house on October 31, testified, in direct contradiction to the police officers, that, for example, he did not hear Donlon ask for the gun back or say that he had other guns in the house. The prosecutor asked the jury to consider why the friend had waited nineteen months to come forward with this important exculpatory testimony:

> You may want to consider as well why this friend of the defendant's waited 19 months before telling anyone that he never saw the police take a gun there that night. 19 months. A friend? And 19 months until he said that he never saw the defendant, never heard him say anything to the police officers about that gun.

The prosecutor was implying that the friend was making up this story. Donlon says the prosecutor's comment is a comment on his own, i.e., *Donlon's own*, failure to testify. If it were a comment about Donlon's failure to testify, it should not, of course, have been made. But, we simply do not see how anyone could construe it as a comment about Donlon, rather than a comment about his friend.

6. Donlon says that the court should have set aside the forfeiture of the bail his brother had posted as collateral guaranteeing his appearance at the sentencing hearing. *See, e.g., United States v. Minor*, 846 F.2d 1184, 1190 (9th Cir.1988) (appellate court can reverse a district court's refusal to set aside a forfeiture of bail if the refusal was an abuse of discretion); *United States v. Gutierrez*, 771 F.2d 1001, 1003 (7th Cir.1985) (same). Assuming for the sake of argument that Donlon has standing to raise this question, he cannot prevail. Donlon did not appear at the sentencing hearing. Indeed, he did not reappear until U.S. Marshals found him some three months later in Conway, New Hampshire, sitting in a truck with a loaded semiautomatic handgun on the floor of the cab. Even then, he ran from them, and they had to chase him to catch him. The evidence easily supports a finding that he violated the conditions of his bail, that government officials, not his brother (the surety) found him, and that he put the government to considerable expense to capture him. We can find no extenuating circumstance (certainly not the circumstance he argues, namely that the probation officer should have had him locked up for violating a "no drug" condition, and that had the probation officer done this, he could not have run away). Consequently, there is no legal basis for setting aside the forfeiture condition. *See Gutierrez*, 771 F.2d at 1003 (quoting *United States v. Castaldo*, 667 F.2d 20, 21 (9th Cir.1981), *cert. denied sub nom. Cotton Belt Ins. Co., Inc. v. United States*, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982)) (factors in determining whether forfeiture of bail should be set aside include "(1) the willfulness of the defendant's breach of conditions; (2) the participation of the sureties in apprehending the defendant; (3) the cost, inconvenience and prejudice suffered by the government as a result of the defendant's breach; and (4) any explanation or mitigating factors presented by the defendant").

The judgment of the district court is

*Affirmed.*