### UNITED STATES of America, Plaintiff–Appellee,

v.

### Nelson Bernardo GOMEZ–LEMOS, Defendant–Appellant.

### No. 89–2166.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 10, 1990.

Decided July 17, 1991.

---

Robert W. Donaldson, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Juan A. Mateo (argued), Detroit, Mich., for defendant-appellant.

Before MERRITT, Chief Judge, and MARTIN and NELSON, Circuit Judges.

MERRITT, Chief Judge.

Two of the government's witnesses in this drug prosecution, Cesar Barraza and Edeardo Osorio, testified before the grand jury but refused to testify at trial. Over defendant's objection, the district court allowed the uncross-examined grand jury testimony of these two alleged co-conspirators to be read into evidence pursuant to Fed.R. Evid. 804(b)(5), one of the residual exceptions to the hearsay rule. In light of the Supreme Court's recent rulings in *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), and *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), we conclude that this ruling violated the Confrontation Clause and we therefore reverse defendant's conviction and remand for a new trial.

### FACTS

In a 1986 sting operation, the Drug Enforcement Administration targeted Alex Cerna as the leader of a large drug importation ring. While the DEA monitored his activities, Cerna planned and carried out a drug smuggling scheme to import 576 kilograms of cocaine and 17,300 pounds of marijuana into Grosse Isle, Michigan by airplane from Columbia. It was a well-planned DEA investigation. Even the pilot and crew of the plane who flew in the drugs for Cerna were undercover DEA agents. After the plane landed on September 3, 1987, the drugs were unloaded and moved to a warehouse. On September 6, 1987, while 400 of the 576 kilograms of cocaine were being loaded into a van, law enforcement personnel entered the warehouse and arrested six people, including alleged co-conspirators Cerna, Osorio, and Barraza. Although DEA agents did not find defendant at the warehouse, they later arrested him at a nearby hotel where he and the others arrested at the warehouse were staying. At trial, the government presented evidence that the cocaine being loaded into the van at the time of the police raid belonged to defendant and was to be distributed by his alleged agents in New York.

In exchange for a reduction in his sentence from 20 to 12 years, alleged co-conspirator Cerna testified in person at trial against defendant and was subject to cross-examination. He stated that defendant owned the 400 kilograms of cocaine being

loaded into the van at the time of the police raid. Cerna testified that in late August 1987 he arranged transportation for a large load of cocaine destined for the United States. A Columbian partner apparently bought the drugs in Columbia. Cerna testified that on August 31, 1987 he received a phone call from defendant's wife stating that defendant urgently needed to speak to him. When Cerna called defendant, defendant allegedly told Cerna that part of the drug shipment belonged to him and demanded to know where the plane containing the drugs would land. Cerna's partner in Columbia confirmed the fact that some of the cocaine belonged to defendant. Informed of animosity that existed between Cerna and defendant due to a prior drug deal, Cerna's Columbian partner told Cerna that he did not have to deal directly with defendant and that defendant's agents would pick up the cocaine. Cerna agreed to this arrangement and called defendant to tell him to bring his drivers to Toledo, Ohio.

The government also called alleged co-conspirator Cesar Barraza to testify against defendant. Although Barraza testified before the grand jury, at trial he stated that he wanted to plead the fifth amendment. The District Court ordered him to answer the questions. When Barraza still refused to testify, the District Court apprised Barraza that he had to testify pursuant to his plea agreement and that he would be sentenced separately for contempt unless he cooperated. After holding Barraza in contempt for refusing to answer its questions, the court found Barraza unavailable pursuant to Fed.R.Evid. 804(b)(5) and admitted his hearsay testimony given without cross-examination before the grand jury.

Barraza's grand jury testimony provided support for the theory that defendant owned part of the cocaine that Cerna imported and that defendant planned to distribute it in New York. Barraza stated that he met defendant for the first time while playing soccer on Miami Beach. According to Barraza, defendant asked Barraza if he would like to make some money by driving Frank Turek, defendant's alleged partner in the drug deal, around New York. Barraza was familiar with the city and agreed to leave whenever defendant asked.

Barraza further testified before the grand jury that several days after initially meeting defendant, he and defendant flew together to Toledo, Ohio, where they were supposed to meet Frank Turek. According to Barraza, defendant flew under the name "Hazbun." Instead of meeting Turek in Toledo, they met two of defendant's associates. The group then drove from Toledo to Dearborn, Michigan, where Turek was waiting. At that point, Turek told Barraza of the plane load of drugs and informed him of his duties: Barraza was to drive Turek and the cocaine to New York. Apparently, Turek did not want to drive because he was in the U.S. illegally. Barraza stated that, after spending a few days in a hotel in Dearborn with defendant, Turek, and several others, he accompanied the group to a warehouse in order to pick up the cocaine. The police arrested him in the raid on the warehouse.

Alleged co-conspirator Edeardo Osorio, Barraza's cousin, also testified before the grand jury and the government called him as a witness at trial. Like Barraza, Osorio was arrested at the warehouse and pleaded guilty under a Rule 11 agreement which required his cooperation. At trial, Osorio also refused to testify, pleading the fifth amendment. The District Court told him that he had to answer the court's questions pursuant to his plea agreement. After repeatedly requesting that defendant answer its questions, the District Court held Osorio in contempt, found him unavailable pursuant to Fed.R.Evid. 804(b)(5) and admitted his hearsay testimony given without cross-examination to the grand jury.

Like Barraza, Osorio testified before the grand jury that he met defendant while playing soccer on Miami Beach. He said that defendant telephoned him and offered him approximately $1000 if he would fly to Washington, D.C., pick up a van, and drive it to Detroit. Osorio agreed and flew to Washington where he met a person defendant allegedly told him to meet at the airport. The two of them picked up a van,

took it to a shop where repairs were made, and then Osorio drove to Michigan with the person he met at the airport. Arriving in Dearborn, Osorio and his traveling companion met defendant at a hotel where defendant and others, including Barraza, were staying. After spending some time in the hotel, Osorio drove the van to the warehouse where the police arrested him in the raid.

Although some law enforcement personnel testified, co-conspirators Cerna, Barraza, and Osorio provided the essential testimony which tended to prove that defendant owned the 400 kilograms of cocaine. The District Court made no finding establishing that defendant prevented either Barraza or Osorio from testifying at trial.

## I.

The District Court admitted the testimony of co-conspirators Barraza and Osorio under Fed.R.Evid. 804(b)(5), the residual exception to the hearsay rule applicable when a declarant is unavailable. This rule permits introduction of hearsay evidence not covered by a specific exception "but having equivalent circumstantial guarantees of trustworthiness" where (1) "the statement is offered as evidence of a material fact," (2) it is more probative than any other evidence that the proponent could reasonably obtain, and (3) "the general purposes of [the Federal Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence."

Defendant contends that introduction of Barraza and Osorio's grand jury testimony violates his sixth amendment right of confrontation and the requirements of Fed.R.Evid. 804(b)(5). We agree with defendant that the Confrontation Clause prohibits the introduction of the two witnesses' testimony.

## II.

In relevant part, the sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." This right of confrontation and cross-examination of adverse witnesses is deeply rooted in our legal culture. *See Coy v. Iowa*, 487 U.S. 1012, 1015–16, 108 S.Ct. 2798, 2799–2800, 101 L.Ed.2d 857 (1988). "There are few subjects ... upon which [the Supreme Court] and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

The right to confront and cross-examine adverse witnesses accomplishes both symbolic and functional goals. First, the Confrontation Clause advances the perception of fairness by "ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable —individuals." *Lee*, 476 U.S. at 540, 106 S.Ct. at 2062. Second, the Confrontation Clause promotes reliability in criminal trials. As the Supreme Court has noted, confrontation

> (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (footnote omitted).

A long line of Supreme Court cases interpreting the Confrontation Clause has created a strong presumption against the trustworthiness of co-conspirators' statements that are made after a conspiracy has terminated in arrest. In the most recent case on point, *Lee v. Illinois*, the Court held inadmissible a co-conspirator's confession. It said that the "truthfinding func-

tion of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." 476 U.S. at 541, 106 S.Ct. at 2062. Due to a co-conspirator's "strong motivation to implicate the defendant and to exonerate himself," a co-conspirator's statements about the defendant's involvement in the crime should be viewed with "special suspicion." *Id.* (quoting from *Bruton v. United States*, 391 U.S. 123, 141, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting) (citations omitted)). This suspicion stems from the "reality of the criminal process, namely, that once partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Id.* 476 U.S. at 544–45, 106 S.Ct. at 2063–64. In the case at bar, it is undisputed that the "jig [was] up" for alleged co-conspirators Barraza and Osorio when they testified against defendant. Their hearsay statements are inadmissible under the Confrontation Clause just as were the statements in *Lee.*

In *Lee*, the petitioner and a co-defendant were involved in a double murder. In finding petitioner guilty of both murders, the trial judge expressly relied on portions of the co-defendant's confession which conflicted with petitioner's testimony that she did not commit one of the murders and that she acted in self-defense or, alternatively, under intense passion in killing the other person. In the case at bar, the grand jury testimony of alleged co-conspirators Barraza and Osorio, which was not subject to cross-examination by defendant, is similar

to the co-conspirator's confession in *Lee*, and, we find, subject to similar dangers. The Court in *Lee* noted that the testimony of Lee's co-conspirator may have been "the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Id.* at 545, 106 S.Ct. at 2064. The dangers enumerated by the Court in *Lee* exist in the grand jury testimony of Barraza and Osorio. That Barraza and Osorio had entered into plea agreements with the Government prior to their grand jury testimony does not necessarily lessen the likelihood that they would want to curry favor with the Government, avenge themselves, or spread the blame by implicating defendant. Furthermore, the mere fact that Osorio and Barraza gave testimony under oath, in the "relatively solemn setting" of a grand jury proceeding, does not guarantee the trustworthiness of their statements implicating defendant. *See Tolbert v. Jago*, 607 F.2d 753, 756 (6th Cir.1979) (Engel, J., concurring), *cert. denied*, 444 U.S. 1022, 100 S.Ct. 682, 62 L.Ed.2d 655 (1980). *See also Garner v. United States*, 439 U.S. 936, 938, 99 S.Ct. 333, 334, 58 L.Ed.2d 333 (1978) (Stewart, J., dissenting from denial of certiorari) ("[t]hat … evidence was … given before a grand jury adds little to its reliability").

The Court's strong predisposition against the use of a co-conspirator's testimony that has not been subject to cross-examination was well-established before *Lee.* Perhaps the most significant case where the Court has spoken on the reliability of a co-conspirator's statement is *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[1] In that case, defen-

---

1. The Court's opinion in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), foreshadowed its later opinion in *Bruton.* In *Douglas*, a defendant and his accomplice were tried separately for assault with intent to commit murder. The accomplice, who had already been convicted and was planning to appeal, pleaded the fifth amendment when called to testify against the defendant. On the pretext of questioning the accomplice, the prosecution read the accomplice's confession, which implicated defendant. After his conviction, defendant appealed on the basis that his sixth amendment right of confrontation had been violated because he had not be able to cross-exam-

ine his accomplice as to the accomplice's confession. *Id.* at 417, 85 S.Ct. at 1075. The Court reversed the defendant's conviction, holding that the prosecutor's reading of the accomplice's confession was equivalent to the introduction of evidence against defendant, *id.* at 419, 85 S.Ct. at 1077, and that defendant's confrontation right was violated because he did not have opportunity to confirm the making of the confession or question the accomplice as to the truth of his statement. *Id.* at 419–20, 85 S.Ct. at 1077–78. In ordering reversal, the Court noted that the accomplice's confession added a "crucial link" to the government's case and that the confession

dants Bruton and Evans were jointly tried for armed postal robbery. At trial, Evans refused to take the stand pursuant to his fifth amendment right; to make its case, the government put forth a witness who testified that Evans had confessed to him that both Evans and Bruton had committed the crime. *Id.* at 124, 88 S.Ct. at 1621. Despite a limiting instructing by the trial judge that the confession could only be used against Evans, the Court nonetheless found that the introduction of Evans' confession which had not been cross-examined by Bruton violated Bruton's right of confrontation. *Id.* at 135, 88 S.Ct. at 1627. Noting the "inevitably suspect" credibility of an accomplice's statements about his alleged co-conspirator, the Court stated that the unreliability of such a confession is "intolerably compounded" when the alleged accomplice "does not testify and cannot be tested by cross-examination." *Id.* at 136, 88 S.Ct. at 1628. The Court added that "[i]t was against such threats to a fair trial that the Confrontation Clause was directed." *Id.* (citation omitted).

In cases decided after *Bruton*, the Court has followed the same analysis. For example, in *Richardson v. Marsh*, the Court upheld the admission of a nontestifying co-conspirator's confession *against the coconspirator himself* in a joint trial but only because there was a limiting instruction and all references to the defendant had been redacted. 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). In *Cruz v. New York*, the Court disallowed introduction of nontestifying co-conspirator's confession which incriminated defendant even though the jury was instructed not to consider confession against defendant. 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In explaining its reasoning, the Court in *Marsh* distinguished the co-conspirator's statement in that case from the one in *Bruton* by noting that the nontestifying co-conspirator's statement in *Bruton* "expressly implicated the defendant as [the] accomplice" of the nontestifying co-conspirator and that the statement was

provided "the only direct evidence" to establish that the defendant had fired the weapon used in

"powerfully incriminating" on its face. *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707. Similarly, Barraza and Osorio's grand jury testimony "expressly implicated" defendant and provided "powerfully incriminating" evidence against him, especially in light of the paucity of direct or inferential proof that he owned part of the cocaine shipment.

### III.

This principle rendering inadmissible uncross-examined co-conspirator's hearsay statements that do not come within the established exception for co-conspirator statements made during and in furtherance of the conspiracy is consistent with the Court's instructions in *Ohio v. Roberts*. 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In *Roberts*, the Court set forth "a general approach" for analyzing whether hearsay admissible under one of the exceptions to the hearsay rule also meets the requirements of the Confrontation Clause. 448 U.S. at 65, 100 S.Ct. at 2538. The first prong requires the prosecution to demonstrate the unavailability of the declarant whose statement it wants to use against defendant. *Id.* As to both Barraza and Osorio, defendant does not question the unavailability of these witnesses. The second prong of *Roberts* requires that the hearsay statement of an unavailable declarant bear adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. at 2539. In *Roberts*, the Court stated that "[r]eliability may be inferred" if the proffered evidence "falls within a firmly rooted hearsay exception." *Id.* We note that the prosecution does not contend that either Barraza or Osorio's grand jury testimony falls within a firmly established hearsay exception, such as that for a co-conspirator's statement. *See* Fed. R.Evid. 801(d)(2)(E). Accordingly, the testimony does not possess by its nature the indicia of reliability of one of the "firmly rooted" exceptions. *See Bourjaily v. United States*, 483 U.S. 171, 182–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987).

the crime. *Id.* at 419, 85 S.Ct. at 1077.

Instead, under *Roberts,* the prosecution must defeat a presumption against the admissibility of Barraza and Osorio's grand jury testimony by showing that their testimony possessed "particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S.Ct. at 2539 (footnote omitted). The Confrontation Clause dictates that these "guarantees of trustworthiness" must be sufficient not to cause a "material departure from the reason of the general [hearsay] rule." *Id.* at 65, 100 S.Ct. at 2539 (quoting from *Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)).

As discussed above, outside of the co-conspirator exception to the hearsay rule (where a statement is made during the course of the conspiracy and not after it has ended), the Supreme Court has consistently concluded that the uncross-examined testimony of an alleged co-conspirator is not sufficiently reliable to meet the requirement of the Confrontation Clause. Our review of the factual circumstances surrounding the grand jury testimony of Barraza and Osorio reveals nothing exceptional which would overcome this strong principle of unreliability. Accordingly, we find that the presumption against reliability has not been defeated.

IV.

■ The District Court erred in relying partially on corroboration from other witnesses as a "particularized guarantee[ ] of trustworthiness" under *Roberts.* Citing the Sixth Circuit opinions *United States v. Curro,* 847 F.2d 325 (6th Cir.), *cert. denied,* 488 U.S. 843, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988), and *United States v. Barlow,* 693 F.2d 954 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), the District Court found significant in its reliability analysis the fact that the hearsay testimony of co-conspirators Barraza and Osorio was corroborated. However, since these cases were decided, the Supreme Court has reversed itself on the question of whether corroboration from other witnesses may be considered in evaluating whether hearsay testimony meets

the reliability requirements of the Confrontation Clause. *Wright,* 110 S.Ct. 3139. In *Wright,* the Court changed course from its earlier plurality ruling in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion). In *Dutton,* four members of the Court stated that a court evaluating the reliability of hearsay evidence could look to corroborating evidence as one factor in determining the reliability of the hearsay. *Id.* at 88. In rejecting this approach, the Court in *Wright* instructs us to focus only on the "relevant circumstances" that "surround the making of the [hearsay] statement and that render the declarant particularly worthy of belief." 110 S.Ct. at 3148. The rationale for the Court's disapproval of the use of corroboration from other witnesses follows from the nature of the established exceptions to the hearsay rule. "The circumstantial guarantees of trustworthiness on which the various specific exceptions to the hearsay rule are based are those that existed at the time the statement was made and do not include those that may be added by using hindsight." *Id.* at 3149 (quoting from *Huff v. White Motor Corp.,* 609 F.2d 286, 292 (7th Cir.1979)). As the Court in *Wright* stated, using corroborating evidence to support a hearsay statement's " 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by boot-strapping on the trustworthiness of other evidence at trial," a result which is "at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant be of marginal utility." 110 S.Ct. at 3150. Accordingly, we find that the District Court also erred in relying on corroborating evidence in finding Osorio and Barraza's testimony sufficiently reliable to satisfy the Confrontation Clause.

V.

None of the other appellate decisions that have upheld the use of uncross-examined grand jury testimony under a residual exception to the hearsay rule provide persuasive authority for altering the outcome

in this case. In *Wright*, the Court clearly stated that, unless a hearsay statement comes within one of the general exceptions to the hearsay rule, a trial judge must only look to the relevant *circumstances* "that surround the making of the [hearsay] statement and that render the declarant particularly worthy of belief" in determining whether the hearsay statement possesses "particularized guarantees of trustworthiness." 110 S.Ct. at 3148. Contrary to this rule, many courts have taken into consideration corroborative evidence in deciding whether the uncross-examined testimony of a witness meets the trustworthiness requirements of *Roberts*. *See, e.g., United States v. Donlon*, 909 F.2d 650, 654–55 (1st Cir.1990); *United States v. Zannino*, 895 F.2d 1, 7 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *Curro*, 847 F.2d at 327; *United States v. Guinan*, 836 F.2d 350, 356–57 (7th Cir.), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *United States v. Marchini*, 797 F.2d 759, 763–64 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Murphy*, 696 F.2d 282, 286 (4th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *Barlow*, 693 F.2d at 962. The *Wright* case overrules these cases.

■ In conclusion, we note that co-conspirators who have entered into a plea agreement or those who have been given use immunity by the government still often possess the motivations to lie noted in *Lee* and earlier cases. For example, entering into a plea agreement or receiving use immunity does nothing to change a co-conspirator's desire to "avenge himself" if he is so inclined. Furthermore, a co-conspirator who has entered into a plea agreement frequently has a strong desire to "curry favor" with the government and "divert attention to another" in hopes that the government will make favorable recommendations to the sentencing judge if the

cooperating witness has not already been sentenced. Even if the cooperating co-conspirator has already been sentenced by the time of his testimony, the government still possesses influence regarding the security level and location of the prison where the co-conspirator is to be incarcerated. Additionally, we note that, even in situations where the prosecutor has strongly advised the cooperating co-conspirator witness of the government's desire that the witness tell the truth when testifying, witnesses sometimes ignore the government's instructions, believing the government's primary goal to be the securing of a conviction regardless of culpability, and therefore these witnesses may fail to testify truthfully. Without cross-examination of a co-conspirator, his confession incriminating a confederate is suspect and generally should not be admitted for the several reasons given by the Supreme Court in *Lee, Bruton, Richardson,* and *Cruz*. The fact that the uncross-examined testimony arises from a plea agreement with the government does not alter this principle.

Moreover a rule allowing the government to replace the live testimony of key witnesses with prior grand jury or other extra-judicial statements creates a powerful incentive for prosecutors to acquiesce in, or even plan, the unavailability of witnesses in order to prevent live confrontation and cross-examination of witnesses in the courtroom. It is much easier to plan a trial and convince a jury of a contested set of facts if the jury hears only the direct testimony from one side. It is also more likely that witnesses will exaggerate, omit crucial facts or falsify if they know their story will not be subject to live confrontation and cross-examination. We must hold to the ancient faith of the common law, incorporated by the founders in the Bill of Rights, that live confrontation and cross-examination of witnesses in the courtroom is the key to finding the truth in a criminal trial [2]—a norm of judicial behavior that will

---

**2.** In *Rolle's Abridgement* in 1668, sworn hearsay is rejected because "the other party could not cross-examine the party sworn, which is the common course." 2 Roll Abr. 679, pl. 9 (1668).

In *Rex v. Paine*, 5 Mod. 163, 165 (1696), the justices of the King's Bench conferred with the justices of the Court of Common Pleas, whereupon "the Chief Justice declared, that it was the

be disregarded only for the most compelling reasons.[3]

Accordingly, we REVERSE defendant's conviction and REMAND for a new trial.

DAVID A. NELSON, Circuit Judge, concurring.

Like my colleagues on the panel, I believe that unless Supreme Court precedent compels a different result, we should try to give the words of the Confrontation Clause the meaning commonly attributed to them at the time the Sixth Amendment was adopted. It is sometimes very difficult to ascertain the precise meaning of language two centuries old, but no such difficulty is presented here. When the Sixth Amendment was adopted, it surely incorporated what Chief Judge Merritt eloquently describes as "the ancient faith of the common law ... that live confrontation and cross-examination of witnesses in the courtroom is the key to finding the truth in a criminal trial."

When Sir Edward Coke published his Institutes in the seventeenth century, there were still courts in England that relied on written depositions taken by "commissioners" who elicited testimony without cross-examination and without the defendant being present. The Court of Chancery normally proceeded on this kind of sworn hearsay in equity cases, for example, and the notorious Court of Star Chamber was empowered to proceed the same way in criminal cases. See Coke, Fourth Institute, Chapters 5 and 64.

The Court of Star Chamber was abolished in 1641, and its name has been a term of opprobrium throughout the English-speaking world from that time to this. The framers of our Constitution were well aware of England's unhappy experience with Star Chamber procedures, and the Sixth Amendment was designed, in part, to forbid the use of the most objectionable of these procedures in the criminal courts of the United States. If the Sixth Amendment is to be applied in accordance with its original meaning, then, I have no hesitancy in saying that "the presumption of inadmissibility accorded accusatory hearsay statements not admitted pursuant to a firmly rooted hearsay exception," *Idaho v. Wright*, ── U.S. ──, 110 S.Ct. 3139, 3152, 111 L.Ed.2d 638 (1990), is strong enough to apply to accusatory hearsay statements made under oath before a grand jury.[1]

We must acknowledge, nonetheless, that although the constitutional right of confrontation[2] extends, by its terms, to "all"

---

opinion of both courts that these [sworn] depositions should not be given in evidence, the defendant not being present when they were taken before the mayor, and so had lost the benefit of cross-examination." In *Queen v. Hepburn*, 11 U.S. (7 Cranch) 290, 296, 3 L.Ed. 348 (1813), Chief Justice Marshall wrote: "Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible." *See also* E. Morgan, *Some Problems of Proof Under the Anglo–American System of Litigation* 106–17 (1956).

3. For example, one compelling reason for disregarding this judicial norm of live confrontation and cross-examination exists where defendant has somehow procured the unavailability of the witness who refuses to testify. In such cases, courts have deemed defendants to have "waived" their right of confrontation and have allowed in otherwise inadmissible hearsay testimony. *See, e.g., Steele v. Taylor*, 684 F.2d 1193, 1200–02 (6th Cir.1982), *cert. denied*, 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983); *United States v. Thevis*, 665 F.2d 616, 632–33 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct.

2300, 73 L.Ed.2d 1303 (1982). In the case at bar, the district court made no conclusive factual finding that defendant procured the unavailability of either Barraza or Osorio.

1. To supplement Chief Judge Merritt's discussion of the common law's historic antipathy to even sworn hearsay, I invite the reader's attention to the excerpt from Sir Matthew Hale's *History of the Common Law* reprinted at Vol. 5 of Kurland & Lerner, *The Founders' Constitution*, page 248 (1987). Published posthumously in 1713, Hale's work presents a detailed and highly persuasive statement of reasons why testimony given "in private before a Commissioner or Two, and a couple of Clerks" is grossly inferior to the presentation of evidence in open court with all concerned—including, interestingly enough, members of the jury—having a right to ask questions of the witnesses.

2. It is axiomatic, of course, that the right of confrontation includes a right of cross-examination. *Lee v. Illinois*, 476 U.S. 530, 539, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986); *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

criminal prosecutions, the Supreme Court has from time to time found reason to allow the admission of hearsay statements that "might be thought to violate the literal terms of the [Confrontation] Clause." *Id.* 110 S.Ct. at 3145. Exclusion of such statements is the norm, but the Supreme Court recognizes a "rule of necessity" under which statements of witnesses who are unavailable to testify at trial may sometimes be admitted. Where such statements do not fall within a firmly rooted hearsay exception, the circumstances of the utterance must provide "particularized guarantees of trustworthiness"—and unless these guarantees are "so clear ... that the test of cross-examination would be of marginal utility," the rule of necessity cannot overcome the terms of the Constitution. *Id.* at 3148–49.

The Supreme Court has not yet had occasion to decide whether the test of cross-examination would be of only "marginal utility" in the case of sworn testimony, not obviously false, delivered before a grand jury. Generally speaking, at least, such testimony has not traditionally been viewed with the "special suspicion," see *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986), that attaches to unsworn statements given to a policeman at the time of an arrest. It remains an open question whether the Supreme Court will view the indicia of reliability normally accompanying grand jury testimony as adequate to make such testimony admissible at trial if the witness is not available to testify there.

Unlike my colleagues, I am not sure that this question remains an open one in our circuit. In *United States v. Curro,* 847 F.2d 325 (6th Cir), *cert. denied,* 488 U.S. 843, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988), a decision published two years after *Lee v. Illinois,* we upheld a criminal conviction despite the introduction at trial of testimony given before a grand jury by a witness (a convicted felon named Louzon) who later committed suicide. Louzon's grand jury testimony was corroborated by independent evidence—a circumstance that under *Idaho v. Wright* is entitled to no weight—but this

was only one of a number of factors we cited in holding the testimony admissible:

"Additionally, Louzon's testimony, delivered at his second grand jury appearance, tracked the testimony of his first appearance. The testimony was given under oath and was never recanted. It involved matters about which Louzon had first-hand knowledge. At the second appearance, Louzon had use immunity and, thus, had additional motivation for telling the truth. It is also clear, as the district court observed, that by testifying before the grand jury Louzon put himself at risk, or at least felt he was at risk, either one of which is another indicator of reliability. Finally, the testimony itself was internally consistent and believable in light of other facts made apparent at trial." 847 F.2d at 327.

These indicia of trustworthiness resemble, in several respects, those present in *United States v. Barlow,* 693 F.2d 954 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), another published decision where we upheld the admissibility of grand jury testimony given by a witness who was not available to testify at trial. Although the substance of the grand jury testimony in *Barlow* was corroborated by separate testimonial and physical evidence, this again was but one of several factors we considered pertinent. Other factors included the circumstance that the declarant had been given immunity from prosecution and thus "had no motive to implicate the defendant and exculpate herself," *id.* at 962; the circumstance that the grand jury testimony was based on personal knowledge; and the circumstance that by itself, the testimony did not relate to evidence of criminal activity. In addition, we said, the trial court could appropriately examine the reason for the unavailability of the witness.

The reason for the unavailability of the two witnesses with whom we are concerned in the case at bar seems to have been that both were simply afraid to testify. Witness Barraza explained from the stand that "I have a family and I just don't feel ... that I want to jeopardize my family." Witness Osorio, when asked if he had not told the government he was unwilling to testify

because he was in fear for himself and his family, refused to give any answer at all. "[I]t's obvious," the district court found, "that this witness is afraid to testify." The district court made a similar finding with respect to Barraza, adding that "[w]hile there is no direct evidence[,] it would appear that the Defendant may have had a role in making the witness unavailable."

We have no basis at all for supposing that it was the government the witnesses were afraid of, and not the defendant. It would be fanciful to assume that the unavailability of the witnesses might have been planned by the government. In our country, fortunately, even the most zealous of prosecutors is unlikely to threaten violence; and although it is conceivable that the government would have preferred that Messrs. Barraza and Osoria not testify, it is far likelier that the government would have preferred that the jury hear their testimony live. Canned testimony read by another is seldom as effective as testimony which the jury hears directly from the witness.

Although we have no reason to suspect that the government had anything to do with the refusal of Barraza and Osorio to testify, it does not follow, of course, that the defendant prevailed upon them to remain silent. A third party might have done so on his own initiative, or the witnesses might have been afraid of the defendant without the defendant's having done anything to inspire such fear. If the trial court had been able to find as a fact that the defendant silenced the witnesses, I would have had no hesitancy in holding that there was a waiver of the defendant's rights under the Confrontation Clause. On the record before us, however, I see no adequate basis for a finding of waiver.

Under our holdings in *Curro* and *Barlow*, a finding of waiver is unnecessary if the grand jury testimony appears trustworthy. Even without the separate corroborating evidence that *Idaho v. Wright* tells us is irrelevant, the logic of *Curro* and

*Barlow* suggests that the grand jury testimony at issue in those cases would have been deemed sufficiently trustworthy to warrant admission at trial. In both cases, the statements of the unavailable declarants were given under oath, subject to the penalties for perjury, and were never recanted.[3] In both cases the statements before the grand jury were made under a grant of immunity from prosecution. And in both cases the declarant had direct knowledge of the matters discussed. Nothing in *Idaho v. Wright* makes it inevitable that *Curro* and *Barlow* would be decided differently today; and if the grand jury testimony in *Curro* and *Barlow* would be admissible today, I am frank to say that I can see no reason why the grand jury testimony of Messrs. Barraza and Osorio would not likewise be admissible.

Assuming, contrary to the assumption of my colleagues, that *Curro* and *Barlow* may still be good law in this circuit, I must come to terms with the tradition of this court which teaches that published panel opinions must be followed by subsequent panels. The latest version of our "Court Policies" says this on the subject:

"Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court en banc consideration is required to overrule a published opinion of this court." Court Policies–Sixth Circuit, Section 10.2 (Spring 1991).

Given my doubts as to the current status of *Curro* and *Barlow*, I am constrained to say that if the government applies for rehearing en banc in this case, I shall support the application. (This does not imply any predisposition to change my views on the merits of the case. I think the panel is correct in its reading of the Confrontation Clause, and, the government not having argued harmless error, I believe the defendant is entitled to a new trial.)

---

3. In the case at bar, similarly, the witnesses were given several opportunities to recant their grand jury testimony, but they never recanted.