**UNITED STATES of America,
Plaintiff,**

v.

**Patrick A. CHAPIN, Defendant.**

**No. 02–20005–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 14, 2002.

Michael J. Hluchaniuk, U.S. Attorney's Office, Bay City, MI, for Plaintiff.

David I. Goldstein, Ann Arbor, MI, for Defendant.

### *OPINION AND ORDER DENYING MOTION IN LIMINE*

LAWSON, District Judge.

This matter is before the Court on the government's "reverse motion in limine" seeking permission to have several out-of-court statements of Edward Romesburg, now deceased, introduced as evidence against the defendant at trial. The defendant has filed an answer in opposition to the motion. The Court has reviewed the submissions of the parties and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2).

The statements in question were made either to police officers over the course of several interviews or to the defendant in tape-recorded conversations instigated at the suggestion of the police. The government argues that some of the statements do not constitute hearsay because they will be offered at trial for purposes other than to prove the truth of their contents. The other statements which admittedly are hearsay, the government contends, are subject to an exception to the hearsay rule and are therefore admissible. Some of the government's arguments are well-taken, but, as explained more fully below, some of the evidence violates the rule against hearsay and would abridge the defendant's rights under the Confrontation Clause, and therefore will not be allowed at trial.

### I.

The government has summarized the facts of the case documented in some measure by the written reports of the investigating Drug Enforcement Administration (DEA) agents. The defendant admits that most of the facts asserted by the government are outside his knowledge.

According to the government, police in the Alpena, Michigan area began investigating one Jeremiah Shields, a suspected drug dealer, in October 2001. They made several purchases of the controlled substance "ecstasy" in that region, but eventually it was necessary for Shields to go to his source for the drugs, who lived in the Ypsilanti–Ann Arbor area, to obtain the greater quantity of drugs the officers wanted to purchase. The first of these controlled purchases apparently took place in December 2001 in Ypsilanti, Michigan. After Shields delivered the ecstasy tablets to the undercover officer, Shields went to an apartment in Ypsilanti which turned out to be the residence of Edward Romesburg, the deceased person whose out-of-court statements the government seeks to introduce here.

Shields made a second delivery to an undercover officer in Ypsilanti on January 10, 2002, after which he was arrested. Shields made a statement identifying Romesburg as his source of the drugs.

A short time later that same day, DEA agents arrested Romesburg as he was leaving his apartment. They took him to the Eastern Michigan University Police Department where he was read his *Miranda* rights and agreed to cooperate. Romesberg made a statement; the government insists that he was not promised anything for his cooperation. He admitted that he had sold ecstasy to Shields and that he was purchasing ecstasy from Patrick Chapin. He also stated that Chapin had supplied him with between 10,000 and 12,000 tablets of ecstasy in a twelve-month period, that he was supposed to obtain more ecstasy from a courier in Chapin's "organization" later that evening, that he

owed Chapin $2,100 from the last purchase he had made, and that he had been on his way to pay Chapin when stopped by the police. The government claims that it did not know of Chapin until Romesburg mentioned his name.

At the request of the officers during the interview, Romesburg called Chapin, told him that he had been delayed, and asked to meet with Chapin in person to pay him the $2,100 he owed. Chapin, who allegedly resided in Ann Arbor, replied that he was on his way to San Diego and did not have time then to meet with Romesburg. Romesburg asked about the impending drug delivery and Chapin said he would contact him later.

Later that day, DEA agents accompanied Romesburg to his apartment in Ypsilanti where they seized $1,100, which Romesburg admitted were drug proceeds, and a small amount of controlled substances.

The officers met with Romesburg again on January 14, 2002. At that time, Romesburg told the officers that Chapin had instructed him to meet with another person in Chapin's organization who would deliver 1,000 to 3,000 ecstasy tablets. Romesburg was to store those drugs and eventually distribute them to other people as directed by Chapin. Romesburg admitted that he had previously stored drugs and dispensed them to individuals sent by Chapin.

Agents made arrangements to record the telephone conversations between Romesburg and Chapin that day, although some calls apparently were not recorded due to equipment malfunctions. In the several calls that were recorded, Chapin told Romesburg he was "out" and trying to acquire more. Chapin asked Romesburg how many he could "get rid of" and how much money he had in his possession. Romesburg told Chapin that he could not sell any, but that he still had the $2,100 he

owed Chapin. Later that evening, Romesburg, having been equipped with a transmitter, met with Chapin at a location in Ann Arbor and was directed to Chapin's apartment. There, Romesburg paid Chapin the $2,100, and Chapin discussed with Romesburg the prospect of going to Canada to obtain more ecstasy.

On January 15, 2002, Romesburg told the agents that earlier that day Chapin had asked him to transport money to Canada for the purpose of purchasing ecstasy. Romesburg was scheduled to meet with Chapin the following day concerning this proposed transaction. Romesburg and Chapin met at Chapin's apartment during the late afternoon on January 16, 2002. Romesburg was equipped with a transmitter, but once again, it malfunctioned and the conversation was not recorded. Romesburg told agents that Chapin provided him with $6,500 and instructed him to take the money to a fast food restaurant in Windsor, Ontario. Chapin planned a rendezvous there with Romesburg and one other person. All of them would be carrying money. Once the three individuals met in Windsor, all the money would be given to Romesburg who would drive to Toronto to pick up ecstasy tablets and transport them back to Windsor.

Romesburg departed Chapin's apartment and followed agents to the Washtenaw County Sheriff's Department as instructed. There, he gave $6,500 to the officers. Later that day, according to plan, Romesburg called Chapin and told him that he was denied entry into Canada, the money was seized after a drug dog had alerted to it, and he was given a receipt at the border. Chapin allegedly expressed dissatisfaction and asked Romesburg several questions about the fabricated events as described by Romesburg.

On January 28, 2002, Romesburg met with DEA agents and turned over a red

briefcase containing 1,000 tablets of ecstasy. He said he had found it at his apartment when he returned there earlier that afternoon. Romesburg said that he believed that one of Chapin's associates had made the delivery. Approximately thirty minutes later, agents recorded a call they had instructed Romesburg to place to Chapin. Romesburg told Chapin that he had sold all of the tablets dropped off for $8,000. Chapin expressed satisfaction and the two agreed to talk again later.

On January 29, 2002, Romesburg told agents that an unidentified person had dropped off $5,000 with him on January 26, 2002, stating the money was to be given to "Patrick." Romesburg explained that he had not mentioned it earlier because he had temporarily misplaced the money. A few minutes later, agents recorded Romesburg's two telephone calls to Chapin to arrange delivery of $13,000 to him. This amount included the $8,000 "sale" amount as well as the $5,000 that had been dropped off to Romesburg's apartment. A meeting was arranged later that day during which Romesburg gave Chapin the money. Following that meeting, Chapin was arrested.

Edward Romesburg died on March 27, 2002. His body was found in his apartment. The government states that the cause of death is unknown and still under investigation. The defendant contends that the death was caused by an accidental or intentional drug overdose.

## II.

The government proposes to offer Romesburg's statements via two different modes. The first consists of the testimony of DEA agents who would relate what Romesburg told them. The second mode would be actual recordings of Romesburg's taped conversations with the defendant. For analytical purposes, the government then suggests that the statements fall into four categories, each carrying a different rationale for admissibility: (1) statements in which Romesburg implicates himself in his own criminal activity, which the government asserts are admissible as statements against interest under Fed.R.Evid. 804(b)(3); (2) statements implicating the defendant in criminal activity, which it claims should be admitted under Fed. R.Evid. 807, the so-called residual hearsay exception; (3) statements made relating to conversations with the defendant, which the government claims are not actually hearsay because they would be offered solely to "explain statements by the defendant," not for the truth asserted in those statements; and (4) statements memorialized in recordings of conversations with the defendant, which the government claims would be offered only to explain the context of said conversations and what the defendant acknowledges therein, not for the truth of the matter asserted.

## A.

█ Statements which fall in the first category are Romesburg's admissions that he sold ecstasy to Shields, and that he had obtained 10,000 to 12,000 ecstasy tablets over a twelve-month period and distributed them. If these statements constitute hearsay, then they are inadmissible unless covered by an exception to the hearsay rule. Fed.R.Evid. 802.

"Hearsay" is defined by the Federal Rules of Evidence as a statement, other than one made by the declarant while testifying at the trial or hearing in which the statement is presented, offered to prove the truth of the matter asserted. Fed. R.Evid. 801(c). The government acknowledges that it would offer Romesburg's admissions to prove that Romesburg was involved in trafficking in ecstasy. However, the government contends that those

statements are admissible under Federal Rule of Evidence 804(b)(3), which states:

> (b) The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> .    .    .    .    .
>
> (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). Each statement made by the declarant which the proponent offers under this exception must be analyzed separately. *United States v. Jinadu*, 98 F.3d 239, 246 (6th Cir.1996) (citing *Williamson v. United States*, 512 U.S. 594, 599–601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). Only those statements that actually inculpate the declarant are admissible, even if those statements are made as part of a broader narrative. *See McClung v. Wal–Mart Stores*, 270 F.3d 1007, 1013–14 (6th Cir.2001) (holding that statement by assailant at plea hearing that he abducted the decedent from one parking lot rather than another exposed him to no additional criminal liability, and therefore was not a statement against interest). Thus, a statement inculpates the declarant only if it would be probative of his conviction at trial. *Jinadu*, 98 F.3d at 246 (finding that adoptive admission of agent's statement that the defendant knew the bags contained heroin was a statement against interest).

In this case, the statements will be offered by the government to incriminate, not exculpate, the defendant. Consequently, "corroborating circumstances" are not required to bolster the trustworthiness of the statements. *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir.1993). However, the problem with evaluating the import of these statements at present stems from the difficulty of assessing context. For instance, in the first example, Romesburg clearly incriminates himself, but he also implicates Shields. Whether Shields has any connection to the defendant or played a role in Chapin's "organization," as the agents' reports characterize Chapin's associates, has not been explained. Similarly, Romesburg apparently stated that he acquired 10,000 to 12,000 tablets of ecstasy in a twelve-month period. But he said that he obtained them *from Chapin*. That statement, therefore, would implicate both Romesburg and the defendant; the Supreme Court has characterized such evidence as "inherently unreliable." *Lilly v. Virginia*, 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

The Court is thus reluctant to approve the admissibility of this category of evidence at this stage of the proceedings without the proponent having identified the exact statements (as opposed to examples of same) it proposes to introduce. A proffer should include the intended purpose of the evidence and a statement of its relevance to the charges in the indictment. At present, however, the government's motion *in limine* as to this category of evidence will be denied without prejudice.

### B.

The second category of evidence—statements by Romesburg which are offered directly to implicate the defendant in the business of trafficking in ecstasy—are clearly hearsay and do not fall within any

of the stated exceptions in Federal Rule of Evidence 803 or 804, as the government acknowledges. The government thus turns to the residual exception now codified in Federal Rule of Evidence 807, which states:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 807.

The defendant argues that Romesburg's statements lack the requisite circumstantial guarantees of trustworthiness and, more importantly, introducing them would abridge his rights under the Confrontation Clause of the Sixth Amendment. ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.)

Both the residual hearsay exception in Rule 807 and the Confrontation Clause require particularized guarantees of trustworthiness. The other prerequisites of Rule 807 are either easily determined (materiality, lack of a non-hearsay source) or overlap with the interests underlying the Confrontation Clause (the interests of justice). Consequently, courts consistently have proceeded directly to the Confrontation Clause inquiry without first determining if the evidence would be properly admitted under Fed.R.Evid. 807 or a state equivalent. *See, e.g., Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *United States v. Gomez–Lemos,* 939 F.2d 326 (6th Cir.1991); *United States v. Canan,* 48 F.3d 954 (6th Cir.1995); *Vincent v. Seabold,* 226 F.3d 681 (6th Cir.2000); *Calvert v. Wilson,* 288 F.3d 823 (6th Cir.2002). That manner of analysis likewise is appropriate here, after first pausing to reflect on the rationale undergirding the rule against hearsay and its exceptions. *See Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ("The historical evidence leaves little doubt ... that the [Confrontation] Clause was intended to exclude some hearsay.")

As the source of proof in trials at the common law evolved from the private knowledge or results of investigation by jurors to the testimony of witnesses in open court, a premium was placed on procedures intended to ensure reliability. The reliability of a witness' testimony depends in large measure on the witness' ability to perceive, remember and relate events, and the witness' sincerity. *See* 2 *McCormick on Evidence,* § 245, p. 93 (5th ed.1999).

In order to encourage witnesses to put forth their best efforts and to expose inaccuracies that might be present with respect to any of the foregoing factors, the Anglo–American tradition evolved three conditions under which witnesses ordinarily are required to testify: oath, personal presence at trial, and cross-examination. The rule against hearsay is designed to insure compliance with

these ideal conditions, and when one of them is absent, the hearsay objection becomes pertinent.

*Ibid.* (footnote omitted).

These testimonial guarantees historically have not been viewed as ends in themselves, but rather as means intended to achieve the ultimate goal: reliability of the evidence considered by disinterested fact finders. Thus, where there are functional substitutes for the testimonial guarantees which ensure reliability, rendering them "a work of supererogation," 5 J. Wigmore, *Evidence* § 1420, at 251 (J. Chadbourn rev.1974), they are comfortably dispatched and exceptions to the rule against hearsay are recognized. *See, e.g. Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (explaining rationale behind excited utterance, dying declaration, and medical treatment hearsay exceptions).

■ The Confrontation Clause was intended to import these same protections assuring reliability into American criminal procedure. As the Supreme Court explained over a century ago:

The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States,* 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The purpose of the Confrontation Clause, then, was to "constitutionalize" the common-law testimonial guarantees by which an accused could test a witness' perception, memory, ability to relate or communicate, and, perhaps most importantly, sincerity.

Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth" [Wigmore, § 1367]; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote omitted).

■ Although the interests embraced by the hearsay rule and the Confrontation Clause are similar, the reach of the two provisions is not conterminous. "The Confrontation Clause ... bars the admission of some evidence that would be otherwise admissible under an exception to the hearsay rule." *Wright,* 497 U.S. at 814, 110 S.Ct. 3139. Likewise, the Supreme Court has never read the Clause literally to require the exclusion of all hearsay. *Roberts,* 448 U.S. at 63, 100 S.Ct. 2531 (to do so would effectuate "a result long rejected as unintended and too extreme"). The Court has recognized two barriers which otherwise admissible hearsay evidence must overcome in order to pass muster under the Confrontation Clause. "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. [Generally,] the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes

to use against the defendant." *Id.* at 65, 100 S.Ct. 2531. Second, if a witness is shown to be unavailable, as in the present case of a deceased witness, "his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.* at 66, 100 S.Ct. 2531.

Because with hearsay, one or more of the testimonial guarantees is absent, other functional substitutes must exist in order to furnish the "indicia of reliability" required by the Confrontation Clause. Those substitutes are ready-made in the case of "firmly rooted hearsay exception[s]," that is, those exceptions which "rest upon such solid foundations that admission of virtually any evidence within them comports with the substance of the constitutional protection." *Ibid.* (internal quotes and citation omitted). When other hearsay exceptions are called into service, "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ibid.*

The proponent of hearsay evidence who resorts to the residual exception does so, axiomatically, because there is no "firmly rooted" exception which otherwise applies to the evidence. He bears a heavy burden to establish reliability since the guarantees of trustworthiness must be "equivalent to those in the first twenty-three exceptions." *United States v. Popenas,* 780 F.2d 545, 548 (6th Cir.1985) (referring to prior codification of the residual exception as Fed. R.Evid. 803(24)). Those guarantees must provide a means of testing, or demonstrating the superfluity of testing, the declarant's perception, memory, ability to relate, and sincerity. The proponent must show that the Court may safely dispense with the testimonial guarantees, particularly the right to physically face and cross-examine the declarant. *See Canan,* 48 F.3d at 960.

The prosecution was unable to meet that burden in *Idaho v. Wright,* a case in which the defendant was convicted of child sexual abuse based on the testimony of a pediatrician who claimed to be reiterating statements made to him by one of the abused children; the testimony was admitted into evidence under Idaho's identically-worded analog to the federal residual hearsay exception. The Court found that the child's statement's were not sufficiently reliable. In its analysis, the Court first held that the residual hearsay exception was not "firmly rooted" for Confrontation Clause purposes. Accordingly, such testimony was "presumptively unreliable and inadmissible for Confrontation Clause purposes," and "must be excluded, at least absent a showing of particularized guarantees of trustworthiness." 497 U.S. at 817–18, 110 S.Ct. 3139. In attempting to detect the requisite guarantees of trustworthiness, the court may not look to external facts, such as corroborating evidence or after-acquired information, but instead must focus on "only those [circumstances] that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 819, 110 S.Ct. 3139. In other words, the court must determine whether the statement is inherently trustworthy at the time it is made. The proponent must prove that the declarant's statement is "so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821, 110 S.Ct. 3139. The Court agreed with the Idaho Supreme Court that since the child's statements did not fall within a firmly-rooted hearsay exception they were presumptively unreliable. Although there was some degree of spontaneity and the statements were made to a physician, there was nothing in the inherent quality of the statements themselves or the circumstances in which they were made that overcame the presumption. *Id.* at 826–27, 110 S.Ct. 3139.

In this case, the government seeks to introduce statements, not of a child declar-

ant, but an accomplice. Accomplice testimony itself historically has come to the courtroom blemished; we instruct juries that it must be viewed "with more caution than the testimony of other witnesses." Sixth Circuit Pattern Criminal Jury Instructions 7.08; *United States v. Ailstock,* 546 F.2d 1285, 1288 (6th Cir.1976). In *Lilly v. Virginia,* the Supreme Court held that an accomplice's out-of-court statement was improperly admitted against the defendant because it was not trustworthy, despite the lower court's ruling that it was supported by a "firmly rooted" hearsay exception. 527 U.S. at 122–23, 139, 119 S.Ct. 1887. Although the accomplice implicated himself in criminal activity, the Court found that statements from criminal confederates "that shift or spread blame to a criminal defendant [ ] fall[ ] outside the realm of those hearsay exceptions that are so trustworthy that adversarial testing can be expected to add little to the statements' reliability." *Id.* at 133, 119 S.Ct. 1887 (quoting *White v. Illinois,* 502 U.S. 346, 357, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)). The plurality rejected the view that a declarant's self-incrimination enhances the reliability of the statement. "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.* at 133, 119 S.Ct. 1887 (citing *Williamson,* 512 U.S. at 599–601, 114 S.Ct. 2431). Thus, the statement-against-interest hearsay exception, to the extent that it extends to statements inculpatory of another, was found not to be firmly rooted for the purposes of Confrontation Clause. *Id.* at 134.

The plurality in *Lilly* explained the near universal rule that untested accomplice testimony cannot survive a Confrontation Clause challenge:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Id.* at 137. In that case, the Court found nothing in the record indicating that the declarant's statements were uniquely trustworthy, much less that "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *Wright,* 497 U.S. at 820, 110 S.Ct. 3139. The receipt of *Miranda* warnings had no bearing on the declarant's trustworthiness. "When a suspect is in custody for his obvious involvement in serious crimes, his knowledge that anything he says may be used against him militates against depending on his veracity." *Lilly,* 527 U.S. at 138, 119 S.Ct. 1887. Similarly, the failure of the police to specifically offer leniency was not entitled to any weight. "The police need not tell a person who is in custody that his statements may gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage." *Id.* at 139, 119 S.Ct. 1887.

The Sixth Circuit has been even more skeptical about the admission of hearsay accomplice testimony. For example, in *United States v. Gomez–Lemos,* 939 F.2d 326 (6th Cir.1991), the court reversed the conviction of a defendant based in part on the introduction at trial of hearsay statements made by accomplices before the grand jury. This testimony, the court found, even though under oath, was not inherently trustworthy, and also had not been subjected to cross-examination. "[O]nce partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become an-

tagonists, rather than accomplices." *Id.* at 330 (quoting *Lee v. Illinois,* 476 U.S. 530, 544–45, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). The Court distinguished this class of statements from those made by co-conspirators *before* the conspiracy has terminated upon arrest, the admission of which is a firmly rooted exception to the general hearsay prohibition. *Id.* at 331–32. *See also Vincent,* 226 F.3d at 687–89 (directing the issuance of writ of habeas corpus to defendant who was convicted in part by police officer's testimony concerning statements made by a co-conspirator while in custody); *Calvert,* 288 F.3d at 832 (reversing denial of writ of habeas corpus to defendant convicted in part with accomplice's tape-recorded confession).

According to *Wright,* and by its own terms, the residual hearsay exception found in Federal Rule of Evidence 807 is not "firmly rooted" in Confrontation Clause jurisprudence. To meet its burden of overcoming the presumption against reliability, the government in this case points to the fact that Romesburg's initial statements to the police were made shortly after Romesburg was arrested and purportedly while he was on his was to pay money to Chapin. The government argues that the statements were unprovoked by a promise of immunity. Other statements, the government asserts, were made when Romesburg knew his conversation with Chapin and his activities would be monitored by the police. Finally, the government contends that reliability is enhanced by the circumstance of multiple statements over a period of time, corroborated by the defendant's reactions.

None of these circumstances establishes the inherent reliability of Romesburg's statements concerning Chapin's role in the drug trafficking conspiracy. The recency of arrest, presumably a startling event for Romesburg, does not engraft the guarantees inherent in the excited utterance exception. Nor does Romesburg's supposed admission that he was on his way to pay money to his supplier, whom the government seeks here to incriminate, carry the same circumstantial guarantees as a present sense impression. These statements were made after it was obvious that "the jig was up," and Romesburg was confronted with the prospect that cooperation might have been his only salvation. Neither the number of statements nor their consistency enhances the inherent trustworthiness of an individual statement to the point that the testimonial safeguards safely could be discarded.

The Court is not convinced that the proposed evidence carries with it the functional substitutes for the testimonial guarantees designed to test the declarant's perception, memory, ability to relate information, and sincerity. The government's citations to *United States v. Colon–Miranda,* 992 F.Supp. 82, 85 (D.P.R.1997) and *United States v. Hamilton,* 948 F.Supp. 635, 639–42 (W.D.Ky.1996), are unavailing. Both cases involved statements by innocent citizens, not criminal accomplices. In the case of out-of-court statements by accomplices, circumstantial guarantees of trustworthiness are absent; the government cannot meet its burden under either Rule 807 or the Confrontation Clause. The evidence will not be admitted at trial.

### C.

Statements which fall in the third and fourth categories are those made by Romesburg, either recorded or overheard, in direct conversations with Patrick Chapin. The government does not suggest that those statements are subject to a hearsay exception. Rather, the government argues that the statements do not constitute hearsay in the first place, and therefore are not subject to the general

rule excluding such evidence contained in Fed.R.Evid. 802. Such statements will be offered, the government asserts, to explain the context in which Chapin's own out-of-court statements were made.

If an out-of-court statement is not offered to prove the truth of the fact contained in the statement, it does not fall within the definition of hearsay. Fed. R.Evid. 801(c). Thus, where the statement's significance lies in the fact that it was made, rather than whether it is true, it is not hearsay. *United States v. Branham*, 97 F.3d 835, 851 (6th Cir.1996) (finding statement offered to show its effect on the listener not hearsay).

The Sixth Circuit has upheld the introduction of out-of-court statements to explain why an investigation began, *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir.2002), to impeach the testimony of a witness, *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 638 (6th Cir.2000), and to demonstrate awareness of an employee's history, *Stalbosky v. Belew*, 205 F.3d 890, 895 (6th Cir.2000). The non-assertive significance of the statement is most evident when its making, regardless of its accuracy, demonstrates an essential element of a claim or an affirmative defense, such as notice. *See, e.g., United States v. Johnson*, 71 F.3d 539, 543 (6th Cir.1995) (holding that declarant's description of overheard telephone conversation conveying information to defendant admissible to prove defendant's knowledge and intent to commit fraud); *United States v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir.1995) (statement introduced to prove it was false, not for its truth); *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir.1991) (affirming introduction of out-of-court statements made by others to the victim explaining the defendant's power to grant permits, where victim's state of mind was an essential element of the offense charged); *Branham*, 97 F.3d at 851. However, when the proffered assertion lacks independent significance and is offered to bolster other statements or conclusions, it is being offered for the truth of the matter and is hearsay. *See In re Air Crash Disaster*, 86 F.3d 498, 535–36 (6th Cir.1996) (holding that statement by company vice-president calling the pilots "SOBs" after examining the cockpit of the crashed plane was essentially being offered to bolster expert's conclusion of negligence, not product defect as the primary cause of the crash).

The government contends that statements Romesburg made relating to the conversations he had with the defendant are admissible to explain the statements made by the defendant in these conversations. For example, on January 10, 2002, Romesburg told the officers that he was supposed to receive drugs from the defendant. In the telephone conversation of that date between the defendant and Romesburg, the parties acknowledge that a "pending deliver[y]" was scheduled and Romesburg's statement explains that the purpose of the acknowledged transaction was the delivery of illegal drugs. Another example of this issue is the conversation between Romesburg and defendant on January 28, 2002. In this conversation, Romesburg tells the defendant that he sold everything for $8,000 and the defendant makes a knowing, positive comment about that news. Romesburg had stated that someone dropped off 1,000 tablets of ecstasy. The defendant's response to Romesburg's statement is an admission as to those facts and Romesburg's statement only explains what the defendant is admitting in the telephone conversation.

Romesburg also apparently made statements during recorded conversations with the defendant. Like those described above, those statements would not be offered to prove the truth of the matter asserted but merely to explain the context

of the conversation and what the defendant acknowledges in the recorded conversation.

The Court would have little trouble finding that Romesberg's statements as part of a tape recorded conversation with the defendant would not be offered for their truth. However, until the actual statements are offered and the Court has the opportunity to hear them in context, it is not possible to give a definitive ruling.

█ The other statements by Romesburg which precede or follow conversations with the defendant fall into a different category. The statement, for example, that Romesburg intended to receive a delivery of drugs from the defendant does more than merely explain ambiguous references to a "transaction" in a subsequent recorded conversation in which the defendant may have participated. That statement would be offered to prove the truth of its substance: that Romesburg would be involved in an illegal drug transaction with the defendant. Likewise, the conversation in which the defendant expressed satisfaction with Romesburg's obtaining $8,000 is probably admissible, but prior statements by Romesburg that he received an anonymous delivery of 1,000 ecstasy tablets proves more than the context of that conversation; it also tends to prove the truth of its substance. The prior assertions would essentially be offered as truthful statements bolstering already-incriminating statements made by the defendant in those conversations. Those statements would constitute inadmissible hearsay. *See Air Crash Disaster*, 86 F.3d at 536 ("The context of the statement conveys part of its meaning—and a statement made in a certain context can go to the truth of a matter even if the text of the statement would not.").

### III.

The Court finds, therefore, that there is an insufficient foundation to determine at this time whether statements of Romesburg which incriminate only himself would be admissible, although this finding does not preclude the government from attempting to establish a proper foundation at a later date. Out-of-court statements made by Romesburg which incriminate the defendant are not admissible under Federal Rule of Evidence 807. Statements made in conversations with the defendant offered to provide context to the defendant's side of the conversation are likely not hearsay, but statements Romesburg made prior and subsequent to his conversations with the defendant are hearsay.

Accordingly, it is **ORDERED** that the government's motion to *in limine* [dkt # 12] is **DENIED** in part without prejudice, and in part with prejudice.