# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 19, 2016 Session

## STATE OF TENNESSEE v. ALBERTO CONDE-VALENTINO

### Appeal from the Criminal Court for Davidson County
### No. 2012-C-2035    J. Randall Wyatt, Jr., Judge

---

### No. M2015-01872-CCA-R3-CD – Filed October 4, 2016

---

The defendant, Alberto Conde-Valentino, appeals his Davidson County Criminal Court jury convictions of felony murder and especially aggravated robbery, claiming that the trial court abused its discretion by denying his motion for severance of co-defendants, that the trial court erred by refusing to instruct the jury on accomplice testimony, and that the evidence was insufficient to sustain his convictions.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal); and J. Michael Engle, Assistant District Public Defender (at trial), for the appellant, Alberto Conde-Valentino.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Davidson County Grand Jury charged the defendant and his two co-defendants, Rodney Earl Jones and Xavier Tull-Morales, with felony murder and especially aggravated robbery arising out of the robbery and fatal shooting of the victim, Victor M. Parham.  The trial court conducted a jury trial in February 2014.

The State's proof at trial showed that, in March of 2012, the victim primarily resided with his girlfriend, Starnesha Grant, in Antioch but maintained his apartment at 935 Allen Road in Donelson.  According to Ms. Grant, the victim owned a lawn-care business but also sold drugs, primarily marijuana and pills.

Ms. Grant testified that the victim and Mr. Jones, a co-defendant, had been roommates in the past and that Mr. Jones had been in the victim's presence when the victim was carrying large sums of money:

> It wasn't uncommon for [the victim] to have money, you know, in several places when he was walking around, you know, maybe in his shoes, in his pockets, so he has always had, you know, he had money on him.
>
> . . . .
>
> For I mean, drug dealing purposes, so if it was maybe something that was about to come up he would have, you know, extra money that you don't want to have, you know, thousands of dollars just in your pocket, you want to kind of have it spread out, that is for if he was to get stopped by, you know, the police, or if somebody was to try to, you know, rob him or anything.

When Ms. Grant left her residence between 8:00 and 8:15 on the morning of March 14, 2012, the victim was asleep in the bed. Shortly after arriving at work, Ms. Grant had to return home to retrieve a shirt, and the victim was still asleep.

Sometime prior to noon on March 14, one of the victim's closest friends, Carlos Burroughs, contacted him and spoke with him on the telephone "for a little bit." During the conversation, the victim told Mr. Burroughs that "he had to run to the house," which Mr. Burroughs took to mean the Allen Road residence.

When Ms. Grant left work at 4:30, she stopped by the victim's Allen Road apartment "to basically roll up some marijuana" and "relax." Upon arrival, she noticed that the car that the victim had been driving was parked by the residence with the windows "cracked" but that the vehicle was unlocked, "which [was] very uncommon."

> It is always common for us to lock the cars, always common to lock a car when you leave it, so which means that would have just mean[t] to me that okay he just ran into the house really quick and he was going to go right back down, so I opened up the car trunk and put the remain[der] of the marijuana I had gotten from a coworker from work in the trunk of my car and it was like, and I texted him, was like

hey, you know, I'm in the driveway.

. . . .

Then when he didn't respond, I'm like that's weird, but the car is here and it is unlocked, let me go knock, knock on the door, you know, so I went and knocked on the door at that point.

Ms. Grant was "[v]ery concerned" when the victim did not come to the door. She knocked "a couple more times," then she left to attend a class in Mount Juliet. As she was leaving, she thought she saw someone through the apartment window, and she returned to the apartment, this time "banging" on the front door. When no one answered the door, she left and went to class.

Ms. Grant returned to the apartment after her class ended at 8:30, and she found it "very strange" that the victim's car, which was still unlocked with the windows partially lowered, had not been moved and that there were no lights on inside the apartment. Ms. Grant testified that the victim "always kept a light on." Ms. Grant drove to her residence, and when she was unable to reach the victim by telephone, she contacted Mr. Burroughs and asked him to accompany her to the Allen Road residence. Mr. Burroughs had also been attempting to reach the victim by telephone, to no avail.

When they arrived, the pair "banged on the door" and attempted to enter through another door, but all doors to the apartment were locked. When Ms. Grant returned home, the victim's brother, Darius Parham, contacted her because he had been unable to reach the victim.

Early the following morning, Ms. Grant and Darius Parham returned to the Allen Road apartment to find it in the same condition as it had been the previous evening. Mr. Parham used an identification card to pick the lock to the victim's back door. Upon entering the apartment, Mr. Parham immediately noticed a knife on the floor, and after taking a few more steps, he encountered the victim's body. Ms. Grant described the scene:

[W]e immediately s[aw] [the victim], just he was, uh, he was laying there and on his stomach, um and we s[aw], um, a knife on the floor, so we thought he was stabbed or something, so when I – when I see him on the floor, I was like DJ call 911, call, you know, call 911, and I was like, I was trying to flip him over, he had his shoe off, just one shoe

though and I couldn't flip him over. I just remember hollering out to DJ. I said, help me, help me, help me. I can't – he is too heavy, I can't push him over. He's so – he's so stiff.

Officers with the Metropolitan Nashville Police Department ("Metro") arrived on the scene on March 15. Upon entering the residence, Metro Officer Johnny Lawrence observed that the victim's body "was partially against the front door," and he noticed "some blood and several shell casings." Metro Officer Jeb Johnston testified that the victim "was obviously deceased." Metro Officer Lynette Mace photographed the crime scene and collected evidence, including a cooler located in an upstairs bedroom which contained $251 and "a baggie of an unknown substance." Metro Officer John Nicholson testified that he directed another officer, since retired, to process the two vehicles at the residence and that the officer found several pill bottles which contained oxycodone.

Metro Detective Jason Moyer collected video surveillance footage from the Bar-B-Cutie restaurant located "on the corner of Donelson and Allen Road, near the address of the incident." Through Detective Moyer's testimony, the State introduced into evidence still photographs taken from the restaurant's video surveillance footage which showed a black sport utility vehicle ("SUV") passing by at 11:56 a.m. and again at 1:39 p.m. on March 14, 2012.

Antwoine Jobe, a childhood friend of Mr. Jones, testified for the State, admitting that he was facing federal narcotics and firearm charges and that he had prior drug convictions as well. Mr. Jobe stated that he intended to plead guilty to the pending charges and conceded that it was his understanding that he could potentially benefit in the sentencing phase based on his cooperation in the instant case.

Mr. Jobe admitted that he was a "drug dealer" and that he sold marijuana and cocaine. Mr. Jobe knew the victim, having grown up with him, and knew that the victim "sold weed and pills."

In March of 2012, Mr. Jones arrived at Mr. Jobe's residence in a black GMC Yukon SUV sometime before noon. Mr. Jones mentioned that "he had his Little G's with him," and Mr. Jobe, who walked outside to see the men to whom Mr. Jones was referring, saw the defendant and Mr. Tull-Morales seated in the SUV. Mr. Jobe stated that he had seen the three men together on prior occasions.

Mr. Jobe returned to his apartment and gave Mr. Jones money for gasoline and a small amount of marijuana, at which point Mr. Jones stated that "we fixin' to get

ready to rob Little Vic." Mr. Jobe knew that Mr. Jones was referring to the victim. According to Mr. Jobe, Mr. Jones had mentioned the possibility of robbing the victim on two prior occasions, telling Mr. Jobe that it would be easy and that the victim "was not going to do nothing." Mr. Jones had even invited Mr. Jobe to participate in the robbery on prior occasions, but Mr. Jobe had declined and had counseled Mr. Jones against it.

Mr. Jones explained to Mr. Jobe that he had sold pills to the victim "a couple of times in the past," and that, on this occasion, he intended to act as "a middle man" between a seller and the victim. Mr. Jones anticipated that the victim would have $2,000 in cash to purchase the pills. Mr. Jobe spent 20 to 30 minutes counseling Mr. Jones against the robbery, and when Mr. Jones left the apartment, Mr. Jobe believed that Mr. Jones had changed his mind. Mr. Jobe even provided Mr. Jones with "some extra drugs" and encouraged him "to go home, to just chill out." At approximately 5:00 or 6:00 p.m. that same evening, Mr. Jones telephoned Mr. Jobe and stated, "'I should have listened to you. Little Vic might be dead.'" Mr. Jobe described Mr. Jones's demeanor at that time as "nervous" and "[s]cared."

The following day, Mr. Jobe picked up Mr. Jones at his residence; Mr. Jobe had already heard that the victim had been killed. During their time together in the car, Mr. Jones stated that "he met up with him and, uh, it went wrong." Mr. Jones had a small-caliber automatic handgun in his possession, which Mr. Jobe opined was "probably like a .32 automatic or a little small .380 or something," and Mr. Jones stated that he "had to get rid of it." Mr. Jobe would not permit Mr. Jones to place the gun inside the glovebox, so as they were crossing a bridge on Old Hickory Boulevard, Mr. Jones tossed the gun into the river. During this same car ride, Mr. Jones asked Mr. Jobe to provide him with an alibi by saying that Mr. Jones had been working for him at the time of the victim's murder, but Mr. Jobe declined.

Approximately one week later, Mr. Jones told Mr. Jobe that he "was going to kill hisself [sic] at one point." Mr. Jones also mentioned that he believed that Mr. Tull-Morales had "said something to his girlfriend or he told somebody what is going on," which caused Mr. Jones to state that "[h]e was going to do something to him . . . [l]ike kill him or something." Mr. Jobe counseled against this course of action, encouraging Mr. Jones to find a way to get Mr. Tull-Morales out of town. A few days later, Mr. Jones contacted Mr. Jobe and told him that he had taken his advice and transported Mr. Tull-Morales to Florida.

Iris Pinson testified that, in March of 2012, she was a neighbor of Mr. Tull-Morales, and that, although she believed that he had a romantic interest in her, they were only friends. Ms. Pinson saw Mr. Tull-Morales every day, and he and the defendant would often come to her apartment to "hang out." Although Ms. Pinson was acquainted

with Mr. Jones and knew him to drive a large, black SUV and spend time with Mr. Tull-Morales and the defendant, she had only seen him "maybe like 6 or 7 times."

On an unspecified morning in March of 2012, the defendant, Mr. Tull-Morales, and Mr. Jones came to Ms. Pinson's residence, and both the defendant and Mr. Tull-Morales told Ms. Pinson that they intended to rob someone. Ms. Pinson recalled that the defendant "was really excited and hyped" about the prospect of the robbery. Mr. Jones "talk[ed] about what they were going to get from the robbery," which was "[d]rugs and money." When the three men left Ms. Pinson's residence, Ms. Pinson saw that both the defendant and Mr. Jones had guns "in plain view." Mr. Tull-Morales told Ms. Pinson that he, too, had a gun, but she "knew that he didn't have any money to buy a gun."

Ms. Pinson saw the three men leave in Mr. Jones's black SUV. The men returned to Ms. Pinson's home after it was dark outside. Ms. Pinson noticed that Mr. Tull-Morales "had a lot of blood" on "his hands, on his shirt" and that he was in possession of "a lot of money" and two "[b]aggies" of drugs, "one with some cocaine in it and there was one with a bunch of pills in it." The defendant had "a similar amount" of blood to that of Mr. Tull-Morales on his shirt and hands, and the defendant "was really nervous and shaky" and "kept saying that he was going to go to jail." Mr. Jones "just had a little blood on his hands and [it was] kind of smeared, but he wasn't like [Mr. Tull-Morales] and [the defendant]."

Ms. Pinson testified about the events of the day as described by Tull-Morales:

> He told me that he waited in the car for a really long time and then he told me that he went up the stairs and knocked on the door and said that he had to go to the bathroom. He was let in and he said that the couch was sitting this way and he said he walked past [the victim] and got his attention and he shot him. He said he blew his face off.

The defendant described the events to Ms. Pinson thusly:

> He said he walked in – he walked up the stairs, knocked on the door and was let in and he said, uh, he ran around the couch and he was stabbed, I don't remember if he said [Mr. Jones] or him did it, but he said that he stabbed him and he said he unloaded on him.

- 6 -

The defendant "threw up all over the place," including "upstairs" in Ms. Pinson's residence and "more than once off of the back porch." According to Ms. Pinson, the three men argued because the money and drugs had already been divided, and Mr. Tull-Morales and the defendant believed that they "didn't get their fair share."

With respect to Mr. Jones, Ms. Pinson recalled that he made the following statements:

> He, well, he said for us to keep our mouth shut about what had happened, he told me to keep my mouth shut about what is going on at the house whenever they got back and he said that he didn't know what anybody was talking about whenever, that he just pretended like nothing had happened.

Ms. Pinson made the three men leave her residence "as fast as [she] could." Ms. Pinson explained that she did not contact the police that night because she was "scared," explaining that she lived "in the middle of horrible projects by [her]self with [her] two kids and [her] sister and they live right behind [her] and both of them have friends, multiple friends there." Ms. Pinson believed that "she would have been hurt with [her] kids."

A "couple of weeks" later, Mr. Tull-Morales was visiting Ms. Pinson, and the two of them were watching the local news on television when pictures of the victim and the outside of the victim's apartment appeared on the screen. Ms. Pinson immediately realized that she knew the victim and had been to his apartment on prior occasions, explaining that the victim had been "friends with [her] sister's boyfriend." When Ms. Pinson told Mr. Tull-Morales that she knew the victim, he told her "that he was sorry and he . . . tr[ied] to apologize to" her.

Shortly thereafter, Mr. Tull-Morales went to Florida, telling Ms. Pinson that "[h]e had shot [the victim] and he didn't want to go back to prison." Approximately six weeks later, Ms. Pinson contacted the police and told them everything she knew about the victim's murder. At the behest of the police officers, she attempted a controlled telephone call to Mr. Tull-Morales, but he did not answer the call. Two days later, using a recording device given to her by the police, Ms. Pinson recorded a telephone conversation with Mr. Tull-Morales, during which Mr. Tull-Morales reiterated that he had "walked up the stairs, . . . he knocked on the door and said he had to go to the bathroom, walked inside and shot him."

Dejyitnu Gabru, the mother of Mr. Jones's girlfriend, testified that, in 2012, she had registered for a family cellular telephone plan. One of the cellular telephones on

that plan had the number 615-300-6009, which belonged to one of her grandsons who was also Mr. Jones's son. Ms. Gabru later learned that Mr. Jones had been using that particular telephone and telephone number. Ms. Gabru also stated that her daughter owned a GMC Yukon, which Mr. Jones drove.

Metro Detective Andrew Vallee testified as an expert witness in the field of cellular telephone record analysis and interpretation. Detective Vallee explained that cellular antennas are strategically placed to provide customers with the best possible cellular telephone reception. Cellular call records will indicate which antennas were used during telephone calls, and the placement of those antennas indicates the general area in which the call was placed:

> Sprint records normally tell us the originating and the terminating cell sites and what that means is when you press the send button on your device it will log the cell site that you are at at that point in time and then you drive around and stay on the cell phone, when you press the end button on your phone, that is the terminating si[t]e, that will also log that cell site.

Upon examining the victim's, Mr. Jones's, and Ms. Grant's cellular telephone records, Detective Vallee determined that the final transmission from the victim's telephone occurred in a communication with Mr. Jones's telephone at 12:16 p.m. on March 14, 2012, and that both telephones used the cellular tower near the victim's apartment on Allen Road.

Through the victim's cellular telephone records, Metro Detective Andrew Injaychock also analyzed the victim's cellular telephone records and determined that Mr. Jones had called the victim "several times a day" leading up to March 14 but that after that final 12:16 telephone call, Mr. Jones "never called him again." With respect to the black SUV, Detective Injaychock explained its connection to the victim's murder:

> We had seen, well, one [Ms.] Pinson had mentioned that they showed up at her house driving it; two, there were Facebook photos of Mr. Jones and the other defendants posing near it; and then we also saw the Bar-B-Cutie video of the GMC driving at the time of the cell phone hitting off of the tower.

On May 20, 2012, Detective Injaychock located a black GMC Yukon at the home of Mr. Jones's girlfriend. Through the aid of a Metro officer who spoke Spanish, Detective Injaychock interviewed the defendant at some point, and the defendant denied knowing

the victim or ever visiting the victim's apartment. The defendant did, however, admit that he knew Mr. Tull-Morales and Mr. Jones, but he claimed that they "were just acquaintances" and that they "did not hang out very often."

Doctor Thomas Deering, the forensic pathologist who conducted the victim's autopsy, determined that the victim had been shot six times and had died on March 14 around noon. Doctor Deering opined that the most significant gunshot wound entered the victim's left shoulder and struck his aorta, causing "a fatal wound." Doctor Deering believed that all six gunshot wounds were inflicted at approximately the same time. Given the lack of soot or stippling on the victim's body, Doctor Deering opined that the shots were fired from "more than two feet away." Doctor Deering determined that the cause of the victim's death was multiple gunshot wounds and that the manner of death was homicide.

Special Agent Alex Brodhag with the Tennessee Bureau of Investigation ("TBI") testified as an expert in the area of firearms examination. Agent Brodhag examined five .380 caliber cartridge casings collected from the crime scene and determined that "all five had been fired in the same weapon." In addition, Agent Brodhag examined the four bullets recovered from the victim's body and one bullet recovered from the crime scene and determined that all five "had been fired through the same barrel."

TBI Special Agent Chad Johnson testified as an expert witness in the field of forensic biology. Agent Johnson analyzed deoxyribonucleic acid ("DNA") swabs collected from the crime scene and determined that a swab taken from "the hallway door of the crime scene" matched the defendant's DNA profile.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, neither the defendant nor the two co-defendants elected to testify, and none chose to present any proof.

Based on this evidence, the jury convicted the defendant as charged of first degree felony murder in the perpetration of a robbery and especially aggravated robbery. The trial court imposed a sentence of life imprisonment for the felony murder conviction, and, following a sentencing hearing, the trial court imposed a concurrent sentence of 15 years for the especially aggravated robbery conviction, to be served at 100 percent by operation of law. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by denying his motion to sever co-defendants, that the trial court erred by refusing to instruct the jury on accomplice testimony, and that the evidence was insufficient to support his convictions. We will address each issue in turn.

## I. Severance

The defendant first contends that the trial court abused its discretion by denying his pretrial severance motion. Specifically, the defendant asserts that the inculpatory out-of-court statements of his co-defendants violated his Confrontation Clause rights, thus necessitating a severance.

"The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the

Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances of an encounter and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 562 U.S. 344, 360 (2011). If the hearsay statement is non-testimonial in nature, then the declarant is not considered a witness as contemplated by the Confrontation Clause, and the statement is admissible, subject to traditional hearsay limitations. *Davis*, 547 U.S. at 822; *State v. Lewis*, 235 S.W.3d 136, 143 (Tenn. 2007).

In the instant case, the defendant complains of the admission of testimony by both Mr. Jobe and Ms. Pinson:

> In the case before the bar, Mr. Jobe testified to statements that he was allegedly told by Mr. Jones that also implicated [the defendant] as well as Mr. Jones himself. Particularly, he stated that he intended to rob [the victim] and insinuated that [the defendant] would participate with him when speaking to Mr. Jones. . . . Similarly, Ms. Pinson testified that she heard Mr. Tull-Morales and Mr. Jones each make statements, in the presence of the other two co-defendants, that they intended to commit a robbery and this, by association, implicated [the defendant].

Here, Mr. Jobe's statements concerning Mr. Jones's plans to rob the victim with the aid of Mr. Tull-Morales, a co-defendant, and the defendant and his later statements that the victim had been killed were not "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52. Similarly, the testimony

of Ms. Pinson regarding the three defendants' statements about their robbery plans and their later statements about the murder and robbery of the victim were not made "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. These statements were all non-testimonial in nature and therefore did not violate the rule announced in *Crawford*. *Id.*

Our conclusion that the statements do not run afoul of *Crawford* does not end our inquiry in this instance because the statements at issue are those of a non-testifying co-defendant. In *Bruton v. United States*, the Supreme Court held that admission of a statement of a non-testifying co-defendant which expressly incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. *See Bruton v. United States*, 391 U.S. 123, 126 (1968); *see also* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The Supreme Court revisited the issue in *Richardson v. Marsh* and stated that *Bruton* was limited to those instances where the co-defendant's challenged statement "'expressly implicat[ed]' the [complaining] defendant as his accomplice." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (quoting *Bruton*, 391 U.S. at 124) (first alteration in *Richardson*). The Court observed that the statement at issue in *Richardson* "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.*

The Court further refined the *Bruton* rule in *Gray v. Maryland*, where the court confirmed that "*Richardson* placed outside the scope of *Bruton's* rule those statements that incriminate inferentially" but cautioned, however, that "*Richardson* must depend in significant part upon the kind of, not the simple fact of, inference." *Gray v. Maryland*, 523 U.S. 185, 195-96 (1998). The Court found that the statement at issue in *Gray*, which had been redacted so as to leave a blank in the space previously occupied by Gray's name, "with the blank prominent on its face . . . 'facially incriminat[es]' the codefendant." *Id.* (quoting *Richardson*, 481 U.S. at 208) (alteration in *Gray*). The Court indicated that the use of a neutral pronoun might have saved the statement from being inadmissible. *Gray*, 523 U.S. at 196-97. Several United States Courts of Appeal have similarly concluded that a *Bruton* issue can be avoided by the use of a neutral pronoun in place of the complaining defendant's name. *See, e.g.*, *United States v. Logan*, 210 F.3d 820, 821–23 (8th Cir. 2000); *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999); *United States v. Verduzco-Martinez*, 186 F.3d 1208, 1214 (10th Cir. 1999); *United States v. Taylor*, 186 F.3d 1332, 1335–36 (11th Cir. 1999).

Mr. Jobe's testimony that Mr. Jones said "we fixin' to get ready to rob Little Vic" includes the neutral pronoun "we" and does not include a direct implication of the defendant. That the "we" includes the defendant became clear "only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208. The statement

inculpated the defendant only after Mr. Jobe testified that he saw the defendant and Mr. Tull-Morales seated outside in the vehicle. Because this statement incriminated the defendant only when linked with other evidence, it falls outside the scope of the *Bruton* rule. Similarly, Ms. Pinson did not testify to any statement made by either co-defendant that expressly implicated the defendant in the crimes. In consequence, her testimony does not violate *Bruton*.

Moreover, federal courts have held that "*Bruton* is not violated where the hearsay statement is otherwise admissible under" the co-conspirator hearsay exception. *United States v. Coco*, 926 F.2d 759, 761 (8th Cir. 1991) (citing *United States v. Bentley*, 706 F.2d 1498, 1507 n.7 (8th Cir. 1983), *cert. denied*, 464 U.S. 830 (1983), *and cert. denied*, 467 U.S. 1209 (1984); *United States v. Kelly*, 526 F.2d 615, 620-21 (8th Cir. 1975), *cert. denied*, 424 U.S. 971 (1976)); *see also United States v. Bartle*, 835 F.2d 646, 652 n.3 (6th Cir. 1987) (observing that Supreme Court case law has made it clear that co-conspirator statements are "'firmly rooted' enough in our jurisprudence to assuage any *Bruton* concerns"). "[O]utside of the co-conspirator exception to the hearsay rule (where a statement is made during the course of the conspiracy and not after it has ended), the Supreme Court has consistently concluded that the uncross-examined testimony of an alleged co-conspirator is not sufficiently reliable to meet the requirement of the Confrontation Clause." *United States v. Gomez-Lemos*, 939 F.2d 326, 332 (6th Cir. 1991). "The Confrontation Clause is satisfied when the out-of-court statement in question comes within a firmly rooted hearsay exception." *Coco*, 926 F.2d at 761; *see also United States v. Mooneyham*, 473 F.3d 280, 287 (6th Cir. 2007) ("Co-conspirator statements in furtherance of a conspiracy are both inherently trustworthy and 'firmly rooted.'").

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

As our supreme court recently confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, No. 14A1098, 2015 WL 5032354 (U.S. Oct. 13, 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to de novo review."

*Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

With respect to the testimony of Ms. Pinson, she stated that the defendant told her "that he was going to rob somebody," and that, after the victim's murder, the defendant told her "that he stabbed him and he said he unloaded on him" and that "he knew he was going to jail." These statements are clearly admissions by a party-opponent and thus fall under an exception to the hearsay rule. *See* Tenn. R. Evid. 803(1.2)(A). Her testimony about statements made by Mr. Tull-Morales and Mr. Jones – that they intended to commit a robbery – not only did not implicate the defendant, but they were also clearly statements made by co-conspirators "during the course of and in furtherance of the conspiracy." Tenn. R. Evid. 803(1.2)(E). Evidence admissible pursuant to the hearsay exception for statements made in the course of or in the furtherance of a conspiracy is not generally excluded by the *Bruton* rule. *See, e.g., Coco*, 926 F.2d at 761.

With respect to the testimony of Mr. Jobe, he stated that Mr. Jones arrived at his apartment on a March morning and mentioned that "he had his Little G's with him." Mr. Jobe saw the defendant and Mr. Tull-Morales seated in Mr. Jones's vehicle. Mr. Jones then told Mr. Jobe that "we fixin' to get ready to rob Little Vic." The "we" inferentially implicates the defendant in the robbery plans but was also subject to the co-conspirator hearsay exception. *See* Tenn. R. Evid. 803(1.2)(E). Mr. Jobe testified that Mr. Jones had attempted to recruit him on prior occasions to rob the victim. Although Mr. Jones did not invite Mr. Jobe's participation on March 12, he stopped by Mr. Jobe's apartment with the defendant and Mr. Tull-Morales to inform Mr. Jobe that they intended to rob the victim, even explaining his plan to act as a middle man and telling Mr. Jobe the amount of money that the victim had been instructed to have to make the false purchase. Not long after leaving Mr. Jobe's apartment, the three men drove to the victim's apartment, where they proceeded to rob and murder him. Without question, the statement that Mr. Jones made to Mr. Jobe that "we fixin' to get ready to rob Little Vic," was made by a co-conspirator "during the course of and in furtherance of the conspiracy" to rob the victim. Tenn. R. Evid. 803(1.2)(E). Because this hearsay statement "is otherwise admissible" under the co-conspirator exception, no *Bruton* violation occurred. *See Coco*, 926 F.2d at 761.

Because the defendant has failed to establish a violation of Confronation Clause rights under either the *Crawford* or *Bruton* rationales, nothing indicates that he was "clearly prejudiced . . . by being jointly tried with his co-defendant[s]." *Howell*, 34 S.W.3d at 491. Accordingly, the trial court did not abuse its discretion by denying the defendant's motion for severance.

## II. *Jury Instruction*

The defendant next argues that the trial court erred by denying his request to instruct the jury on accomplice testimony. Specifically, the defendant advanced the theory that Mr. Jobe was an accomplice to the charged crimes because he knew of Mr. Jones's planned robbery and assisted Mr. Jones in the disposal of his handgun. The State responds that the defendant has waived our consideration of this issue by failing to submit his requested jury instruction in writing. In his reply brief, the defendant counters that a written instruction was not warranted because he was requesting the Tennessee Pattern Jury Instruction on accomplice testimony and not a "special" instruction.

Tennessee Rule of Criminal Procedure 30 provides as follows:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court may also entertain requests for instructions at any time before the jury retires to consider its verdict.

Tenn. R. Crim. P. 30(a)(1).

Without question, the defendant failed to submit a written request. Regardless of whether he was required to submit his requested instruction in writing, however, the trial court was under no duty to charge the jury on accomplice testimony because it was not fairly raised by the evidence. *See State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995); *State v. McPherson*, 882 S.W.2d 365, 374 (Tenn. Crim. App. 1994). Mr. Jobe's involvement in the instant case, as noted by the trial court, was limited to his "slow[ing] the car down while giving Mr. Jones a ride as they crossed the river," permitting Mr. Jones the opportunity to "thr[o]w the gun out the window." This evidence was clearly insufficient to support a finding that Mr. Jobe was an accomplice to the murder and robbery of the victim, and thus, no such jury instruction was warranted.

*III. Sufficiency*

Finally, the defendant contends that the evidence adduced at trial was insufficient to support his convictions. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). "Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). Under the theory of criminal responsibility, the defendant's presence and companionship with the perpetrator

- 16 -

of a felony before and after the commission of the crime are circumstances from which the defendant's participation may be inferred. *See State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *Id.*

Here, the proof adduced at trial established that the defendant and Mr. Tull-Morales accompanied Mr. Jones to Mr. Jobe's apartment on a morning in March 2012, arriving in a black GMC Yukon SUV; Mr. Jones often drove his girlfriend's black GMC Yukon SUV. Mr. Jones informed Mr. Jobe that "we fixin' to get ready to rob" the victim, something that Mr. Jones had discussed on prior occasions as well. Mr. Jones explained that he planned to act as the middle man between the victim and the seller and that the victim was expecting to purchase pills worth $2,000. Ms. Pinson described a similar situation on a morning in March, when Mr. Tull-Morales, Mr. Jones, and the defendant came to her apartment, and both the defendant and Mr. Tull-Morales told her that they intended to rob someone of "[d]rugs and money." When the three men left her apartment, Ms. Pinson saw that both the defendant and Mr. Jones had handguns "in plain view."

On the morning of March 14, 2012, the victim was asleep in bed at Ms. Grant's apartment in Antioch. Before noon, Mr. Burroughs spoke with the victim by telephone, and the victim told Mr. Burroughs that "he had to run to the house." Video surveillance footage from the Bar-B-Cutie restaurant, which was located near the victim's Allen Road residence, showed a black SUV passing by at 11:56 a.m. on March 14, 2012. The final transmission from the victim's cellular telephone occurred in a communication with Mr. Jones's telephone at 12:16 p.m. on March 14; both telephones used the cellular tower located near the victim's residence. The Bar-B-Cutie surveillance footage showed a black SUV drive by again at 1:39 p.m.

When Ms. Grant, Mr. Burroughs, and Mr. Parham attempted to contact the victim later in the day, they were unable to reach him. Ms. Grant was very concerned that the victim had left his vehicle unlocked and had left no lights on in his apartment, which, she testified, was very unusual.

In the early evening hours of the same date on which Mr. Jones had visited Mr. Jobe's residence and told him of the planned robbery, Mr. Jones called Mr. Jobe and stated, "'I should have listened to you. Little Vic might be dead.'" On the same date on which the defendant and Mr. Tull-Morales told Ms. Pinson about the planned robbery, the three men arrived at her apartment after dark. All three men had visible blood on their clothes and hands, and Mr. Tull-Morales had "a lot of money" and two "[b]aggies" of drugs, including cocaine and pills. Mr. Tull-Morales told Ms. Pinson that he walked

into the victim's apartment, "got his attention and he shot him. He blew his face off"; Mr. Tull-Morales reiterated this version of events in a recorded telephone call with Ms. Pinson a few weeks later. The defendant also provided his version of events to Ms. Pinson before he "threw up all over the place," including "upstairs" in Ms. Pinson's residence and "more than once off of the back porch". The three men also argued over the division of the drugs and money because Mr. Tull-Morales and the defendant believed that they did not "get their fair share."

The following morning, Mr. Jobe picked up Mr. Jones. Mr. Jobe had already heard that the victim had been killed, and Mr. Jones stated that "he met up with him and, uh, it went wrong." During their time in the car, Mr. Jones threw a small-caliber handgun into the river as the men were driving over a bridge. Mr. Jones asked Mr. Jobe to provide him with an alibi for the time in which the victim had been murdered, but Mr. Jobe refused.

On the morning of March 15, Ms. Grant and Mr. Parham broke into the victim's residence and discovered his body on the floor near the front door. Doctor Deering determined that the victim had been shot six times from "more than two feet away" around noon on March 14, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide. Agent Brodhag, after analyzing the cartridge casings and bullets recovered from the scene and the victim's body, determined that all five casings had been fired from the same weapon and that all five bullets had been fired through the same barrel. Although the defendant had denied to Metro officers that he had ever met the victim or visited his apartment, DNA analysis revealed that a swab taken from a door in the victim's apartment matched the defendant's DNA profile.

Taking all of this evidence into consideration, we find that the evidence overwhelmingly supports the defendant's convictions of felony murder and especially aggravated robbery. Although little indicated that the defendant was the victim's shooter, the defendant's "presence and companionship" with Mr. Tull-Morales and Mr. Jones both before and after the commission of this crime permit the inference of the defendant's participation, *Watson*, 227 S.W.3d at 639 (citing *Ball*, 973 S.W.2d at 293), and, thus, the defendant was criminally responsible for the acts of his co-defendants and is therefore guilty of felony murder and especially aggravated robbery.

*IV. Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE